JACOBS, Circuit Judge.
 

 Over a period of years, debtor-appellant Sharp International Corporation (“Sharp”) was looted by its controlling shareholders. Now, through its trustee in bankruptcy, Sharp sues one of the company’s former lenders, State Street Bank and Trust Company (“State Street”), which suspected the fraud and extricated itself in a way that, according to Sharp, facilitated the victimization of other lenders and the continued looting of Sharp itself. Sharp seeks recovery of funds looted after State Street should have sounded the alarm, as well as a loan repayment Sharp made to State Street in that period.
 

 Sharp appeals a December 5, 2003 order of the United States District Court for the Eastern District of New York (Trager, /.), granting State Street’s motion to dismiss Sharp’s claims that State Street aided and abetted breaches of fiduciary duty by Sharp’s controlling shareholders, and received a payment from Sharp that constituted a constructive or intentional fraudulent conveyance. The district court’s order affirmed a July 30, 2002 order of the United States Bankruptcy Court for the Eastern District of New York (Craig,
 
 J.).
 

 We conclude that Sharp has not pled facts that would entitle Sharp to relief under any of the legal theories it advances. The judgment of dismissal is affirmed.
 

 BACKGROUND
 

 On review of a motion to dismiss the complaint, we assume the truth of the factual allegations; the following facts are primarily drawn from Sharp’s complaint.
 
 See Lentell v. Merrill Lynch & Co.,
 
 396 F.3d 161, 165 (2d Cir.2005).
 

 Sharp was a closely-held New York corporation engaged in the business of importing, assembling, and distributing wrist watches, clocks, pens, and mechanical pencils. The brothers Bernard, Herbert, and Lawrence Spitz purchased 100% of Sharp in February 1993 and were the sole officers of the company from then until October 1999. In January 1995, the Spitzes sold 13% of Sharp to Bohorodzaner, Inc., which secured a seat on the Sharp board and a variety of corporate governance rights, including the right to inspect Sharp’s books and records. Bohorodzaner had no knowledge of the Spitzes’ fraud during the relevant time period.
 

 The fraud started at some point prior to 1997, continued through October 1999, and operated in two steps.
 

 First, the Spitzes falsified sales, inventory, and accounts receivable, and invented customers, in order to report fictitious revenue on Sharp’s nonpublic financial records. According to the complaint, “[tjhrough manipulations of this sort, the Spitzes caused Sharp to fraudulently report that its net sales were $52.1 million in fiscal 1997 (when its actual sales were approximately $24 million), $80.2 million in fiscal year 1998 (when its actual sales were approximately $21 million), and $118.1 million in fiscal 1999 (when its actual sales were approximately $19 million).” Compl. ¶ 14. These inflated revenue figures were used to borrow “increasingly large sums of money from a succession of banks and other lenders.” Compl. ¶ 15.
 

 At the second step of the fraud, the Spitzes looted the fraudulently raised funds as well as other corporate profits. In 1998 and 1999 alone, the Spitzes divert
 
 *47
 
 ed more than $44 million from Sharp to their various entities.
 

 Sharp began borrowing from State Street in November 1996, when State Street approved a $20 million demand line of credit secured by Sharp’s (supposed) assets. In July 1998, Sharp raised an additional $17.5 million through the sale of subordinated notes to a group of investors, including Massachusetts Mutual Life Insurance Company, Albion Alliance Mezzanine Fund, L.P., Travelers Insurance Company, and certain of their affiliates (collectively, the “Noteholders”).
 

 Nancy Loucks, a Senior Vice President and Credit Risk Officer at State Street, had lending responsibility over Sharp. State Street began to suspect fraud in the summer of 1998, by reason
 
 (inter
 
 alia) of: (i) Sharp’s refusal to comply with accounting procedures required under the Sharp/ State Street loan agreement; (ii) Sharp’s fast growth and voracious consumption of cash; and (iii) Loucks’s experience with similar instances of corporate fraud, including fraud at a company called PT Imports. During the summer and fall of 1998, Loucks devoted more time to the Sharp account than any of her other accounts. Twice State Street took the “unusual step” of contacting Sharp’s customers directly to verify that they were, in fact, purchasing Sharp products.
 

 In the fall of 1998, Sharp was current in its loan payments to State Street and well within its credit line limits; based on Sharp’s financials, the State Street loan appeared to be over-secured. Nevertheless, in September 1998, Loucks took several precautionary measures. She (i) assigned an employee from the State Street loan workout department to assist with the account; (ii) hired outside counsel specializing in troubled loans; and (iii) alerted more senior State Street employees of her concerns.
 

 In October 1998, State Street sought more information from Sharp about its largest customers, and asked to see the 1998 work papers of Sharp’s outside auditor, KPMG Peat Marwick (“KPMG”). Also in October 1998, State Street’s outside counsel retained a firm specializing in financial investigation, called First Security, to conduct a formal investigation of Sharp. First Security’s 60-page report, presented in November 1998, heightened Louck’s anxiety.
 

 In November 1998, State Street: (i) requested formal confirmations of Sharp’s receivables (which the Spitzes refused to give); (ii) reviewed checks passed through State Street’s “demand and deposit” account to see if any substantial payments had been made to the Spitzes; and (iii) requested Sharp’s detailed accounts receivable statement and cash receipts (which the Spitzes agreed to provide at first, then refused). On November 18, 1998, Loucks received Dun
 
 &
 
 Bradstreet reports on 18 of Sharp’s purported customers. One customer could not be located; one had been out of business since 1991; others, to which Sharp claimed to sell watches, were engaged in different lines of business altogether. At this point, State Street concluded its investigation of Sharp.
 

 The nub of the complaint is that State Street then arranged quietly for the Spitzes to repay the State Street loan from the proceeds of new loans from unsuspecting lenders, thus avoiding a repeat of the PT Imports losses:
 

 State Street demanded and obtained Sharp’s agreement to secure new financing from investors unaware of the fraud, and to use that financing to pay off State Street’s line of credit. In exchange, State Street agreed to give Sharp until March 31, 1999 to obtain this new financing and to retire the State Street debt.
 

 
 *48
 
 Compl. ¶ 50. Sharp promptly approached the Noteholders for an additional $25 million in financing ($10 million more than Sharp owed to State Street). While that transaction went forward, State Street gave no warnings and blew no whistles, ignored inquiring calls from the Notehold-ers, preserved Sharp’s line of credit when it had the right to foreclose and pull the plug, and gave Sharp its needed consent to the new indebtedness.
 

 On March 23, 1999, the unsuspecting Noteholders purchased an additional $25 million in subordinated notes from Sharp. Sharp paid State Street roughly $12.25 million from the proceeds, and the Spitzes gave personal promissory notes for the remaining $2.75 million of the State Street debt.
 

 In July 1999, KPMG refused to issue a 1999 audit opinion on Sharp, withdrew its 1997 and 1998 audit opinions, and terminated its engagement with the company. In September 1999, the Noteholders commenced an involuntary Chapter 11 bankruptcy proceeding against Sharp.
 

 In November 2000, the bankruptcy court entered a $44.38 million judgment against the Spitzes (and three of their companies, jointly and severally). That judgment remains unsatisfied. The Spitzes later pled guilty to criminal charges of defrauding State Street and others.
 
 See Albion Alliance Mezzanine Fund, L.P. v. State Street Bank & Trust Co.,
 
 No. 602711/01, slip op. at 6 (N.Y.Sup.Ct. Apr. 14, 2003)
 
 aff'd
 
 2 A.D.3d 162, 767 N.Y.S.2d 619 (2003).
 

 On May 30, 2001, Sharp commenced this adversary proceeding against State Street in the bankruptcy court, claiming as damages $19 million that the Spitzes looted in the period between State Street’s discovery of the fraud (in November 1998) and the bankruptcy court’s removal of the Spitzes from Sharp’s business operations (in October 1999), as well as the $12.25 million payment made to State Street from the proceeds of the subordinated notes sold to the Noteholders in March 1999. State Street moved to dismiss on the grounds that the complaint: (i) failed to plead the aiding and abetting of a breach of fiduciary duty under Federal Rules of Civil Procedure 12(b)(6) and 9(b); (ii) failed to state a claim for intentional or constructive fraudulent conveyance; and (iii) was barred by the doctrine of
 
 in pari delicto.
 

 The bankruptcy court dismissed Sharp’s complaint in its entirety. As to the claim for aiding and abetting a breach of fiduciary duty, the court ruled that Sharp failed to plead that State Street had actual knowledge of the second stage of the Spitzes’ fraud
 
 (i.e.,
 
 the looting), or that State Street “participated in” or “induced” the Spitzes’ fraud.
 
 Sharp Int’l Corp. v. State Street Bank & Trust Co. (In re Sharp Int’l Corp.),
 
 281 B.R. 506, 515-17 (Bankr.E.D.N.Y.2002). The constructive fraudulent conveyance claim was dismissed for failure to allege that State Street’s receipt of the March 1999 payment from Sharp was not in “good faith”; and the intentional fraudulent conveyance claim was dismissed for failure to allege “badges of fraud.”
 
 Id.
 
 at 517-24. The bankruptcy court did not reach State Street’s
 
 in pari delicto
 
 argument.
 
 Id.
 
 at 524.
 

 Sharp appealed the bankruptcy court rulings to the district court. Meanwhile, the Noteholders filed their own suit against State Street in New York County Supreme Court, alleging fraud, negligent concealment, and aiding and abetting fraud.
 
 [1]
 
 On December 5, 2003, the district
 
 *49
 
 court affirmed the bankruptcy court’s dismissal of Sharp’s claims, concluding that although Sharp had adequately alleged State Street’s actual knowledge of the Spitzes’ entire two-step scheme, Sharp had not alleged that State Street “participated in” or “induced” the Spitzes’ fraud, and affirming the bankruptcy court in all other material respects.
 
 See Sharp Int’l Corp. v. State Street Bank & Trust Co. (In re Sharp Int’l Corp.),
 
 302 B.R. 760 (E.D.N.Y.2003). We affirm for substantially the same reasons as the district court.
 

 DISCUSSION
 

 Sharp argues that the district court erred in dismissing the claims that State Street: (i) aided and abetted the Spitzes’ breaches of fiduciary duty; and received a payment from Sharp that constituted (ii) a constructive fraudulent conveyance, or (iii) an intentional fraudulent conveyance.
 

 This Court reviews
 
 de novo
 
 a district court’s grant of a motion to dismiss, “a standard pursuant to which we accept all of the plaintiffs’ factual allegations as true and draw all reasonable inferences in favor of the plaintiffs.”
 
 Mason v. Am. Tobacco Co.,
 
 346 F.3d 36, 39 (2d Cir.2003). “Dismissal is proper if, accepting all the allegations in the complaint as true and drawing all reasonable inferences in plaintiffs favor, the complaint fails to allege any set of facts that would entitle plaintiff to relief.”
 
 Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,
 
 343 F.3d 189, 194 (2d Cir.2003).
 

 In considering claims based in New York law (as here), this Court “determine[s]
 
 de novo
 
 what the law of New York is.”
 
 McCarthy v. Olin Corp.,
 
 119 F.3d 148, 153 (2d Cir.1997). In making that determination, this Court “afford[s] the greatest weight to decisions of the New York Court of Appeals.”
 
 Id.
 
 If the New York Court of Appeals has not spoken, this Court may consider lower New York court opinions as “ ‘the best indicators’ ” of how the Court of Appeals might decide an issue.
 
 Id.
 
 (quoting
 
 In re Brooklyn Navy Yard Asbestos Litig.,
 
 971 F.2d 831, 850 (2d Cir.1992)).
 

 A. Aiding and Abetting the Breaches of Fiduciary Duty
 

 Under New York law, there are three elements to a claim for aiding and abetting a breach of fiduciary duty. The first element is “a breach by a fiduciary of obligations to another,” of which the aider and abettor had “actual knowledge.”
 
 Kaufman v. Cohen,
 
 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169 (1st Dep’t 2003) (“Although a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendant had actual knowledge of the breach of duty.”);
 
 see also Wechsler v. Bowman,
 
 34 N.E.2d 322, 326, 285 N.Y. 284, 291 (1941) (“Any one who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the
 
 cestuis que
 
 trust.”). The second element is “that the defendant knowingly induced or participated in the breach”; and the third element is “that plaintiff suffered damage as a result of the breach.”
 
 Kaufman,
 
 307 A.D.2d at 125, 760 N.Y.S.2d 157;
 
 see also Wight v. BankAmerica Corp.,
 
 219 F.3d 79, 91 (2d
 
 *50
 
 Cir.2000) (reciting elements of New York aiding and abetting a breach of fiduciary-duty law);
 
 S & K Sales Co. v. Nike, Inc.,
 
 816 F.2d 843, 847-48 (2d Cir.1987) (same);
 
 Whitney v. Citibank, N.A.,
 
 782 F.2d 1106, 1115 (2d Cir.1986) (same).
 

 The bankruptcy judge and the district judge disagreed regarding whether State Street had actual knowledge of both steps of the Spitzes’ fraudulent scheme; but we need not reach that issue because we agree with both judges that the complaint insufficiently alleges knowing inducement or participation. Thus, for purposes of the current appeal, we assume State Street knew about the looting as well as about the use of phony books and records to obtain loans.
 

 The district court and the bankruptcy court also disagreed about the nature of the relevant fraud. The bankruptcy court conceptually severed the Spitzes’ fraud into two distinct breaches of fiduciary duty: (i) fraudulently borrowing funds on behalf of Sharp; and (ii) looting those (and other) funds from Sharp.
 
 See Sharp Int’l Corp. v. State Street Bank & Trust Co. (In re Sharp Int’l Corp.),
 
 281 B.R. 506, 515 (Bankr.E.D.N.Y.2002) (“The fact that a company is inflating its receivables does not necessarily mean that the company’s principals are looting it.”). The district court, however, viewed the Spitzes’ fraudulent activities as part of a single scheme.
 
 See Sharp Int’l Corp. v. State Street Bank & Trust Co. (In re Sharp Int’l Corp.),
 
 302 B.R. 760, 771 (S.D.N.Y.2003) (“The fraudulent financial reporting through which the Spitzes induced creditors to loan money to Sharp and the Spitzes’ embezzlement of those and other corporate funds were two steps in a single scheme.”).
 

 We need not reconcile these perspectives. Regardless of whether the Spitzes’ numerous breaches of fiduciary duty are best viewed as a single scheme or as several distinct breaches, damages remains an element of the cause of action,
 
 see S & K Sales,
 
 816 F.2d at 847-48 (“The claimant must prove ... that the plaintiff suffered damages as a result of the breach.”), and the damages claimed by Sharp are premised and calculated on the $19 million that the Spitzes looted from Sharp, not their fraudulent borrowing on Sharp’s behalf.
 
 See
 
 Compl. ¶ 58 (“Between November 1998, when State Street discovered the Sharp fraud, and October 1999, when [the trustee in bankruptcy] took over management of Sharp, the Spitzes looted Sharp of more than $19 million-”). Therefore, Sharp has stated the claim that State Street aided and abetted the Spitzes’ breach of fiduciary duty to Sharp if Sharp has alleged State Street’s knowing inducement of or participation in the breach committed by the Spitzes that resulted in damages Sharp
 
 seeks
 
 — ie., the $19 million that the Spitzes looted after Sharp allegedly should have blown the whistle.
 

 “Inducement” seems to be undefined under New York law, but is a common enough term.
 
 See Black’s Law Dictionary
 
 at 790 (8th ed.2004) (defining “inducement” as “[t]he act or process of enticing or persuading another person to take a certain course of action”). “A person knowingly participates in a breach of fiduciary duty only when he or she provides ‘substantial assistance’ to the primary violator.”
 
 Kaufman,
 
 307 A.D.2d at 126, 760 N.Y.S.2d 157. Substantial assistance may only be found where the alleged aider and abettor “affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.”
 
 See id.
 
 “[T]he mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.”
 
 Id.; see also Diduck v. Kaszycki & Sons Contractors,
 
 
 *51
 

 Inc.,
 
 974 F.2d 270, 284 (2d Cir.1992) (under federal law, “[o]ne participates in a fiduciary’s breach if he or she affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables it to proceed”),
 
 abrogated on other grounds as noted in Gerosa v. Savasta & Co.,
 
 329 F.3d 317, 319 (2d Cir.2003). Since Sharp does not contend that State Street owed Sharp a fiduciary duty, Sharp must allege that State Street committed affirmative acts that furthered the Spitzes’ breaches of fiduciary duty to Sharp and caused Sharp the $19 million loss.
 

 The complaint cites five acts by State Street that are alleged to satisfy these standards; we consider these acts in turn. Ultimately, we conclude that the complaint says no more than that State Street relied on its own wits and resources to extricate itself from peril, without warning persons it had no duty to warn.
 

 Sharp first alleges that after learning about the Spitzes’ fraud, State Street demanded that Sharp obtain new sources of financing to retire the State Street debt:
 

 State Street demanded and obtained Sharp’s agreement to secure new financing from investors unaware of the fraud, and to use that financing to pay off State Street’s line of credit. In exchange, State Street agreed to give Sharp until March 31, 1999 to obtain this new financing and to retire the State Street debt.
 

 Compl. ¶ 50.
 

 This allegation cannot be characterized as either participation or substantial assistance. Therefore, this allegation assists Sharp only if it qualifies as an inducement. No doubt, a request for repayment does exert some sort of pressure, and any pressure can be seen as an inducement, at least incrementally. But that is an unhelpfully broad reading of inducement in this context. The demand at issue was for no more than was owed: repayment of Sharp’s outstanding debt to State Street. State Street had a right to foreclose (as the complaint alleges); yet State Street evidently did not expect foreclosure to be efficacious. Under the circumstances, the demand for repayment of a bona fide debt is not a corrupt inducement that would create aider and abettor liability.
 

 On appeal, Sharp contends that State Street “demand[ed] that the Spitzes obtain new financiers
 
 in exchange for State Street’s silence.”
 
 (Emphasis added). However, the argument that State Street offered its silence as an inducement runs counter to the complaint, which affirmatively alleges that “State Street elected not to confront the Spitzes with what it knew.” Compl. ¶ 48. The complaint alleges only that State Street demanded that the Spitzes find other sources of financing, a demand that was consistent with State Street’s contractual and legal rights. As the district court observed, this request, without more, could not have “induced” the Spitzes to commit a fraud that they had begun long before. In any event, Sharp does not allege — and logically cannot allege — that State Street’s demand for repayment induced the looters to loot, or to loot more.
 

 Sharp further alleges that State Street: (i) “deliberately concealed its knowledge of the fraud at Sharp”; (ii) elected not to foreclose on the loan; and (iii) “avoided the Noteholders’ repeated attempts to reach” State Street in order to discuss the Sharp credit. Compl. ¶ 17, 52-53. Artful pleading aside, all of these allegations come down to omissions or failures to act:
 
 i.e., not
 
 revealing what State Street knew and suspected,
 
 not
 
 foreclosing,
 
 not
 
 responding to inquiries. As such they are not “substantial assistance,” as that term
 
 *52
 
 is elucidated in
 
 Kaufman:
 
 “Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.” 307 A.D.2d at 126, 760 N.Y.S.2d 157. Absent a duty to act,
 
 [2]
 
 the only action prescribed is not to “affirmatively assist” or to “help conceal,” which is another form of assistance and is likewise affirmative in nature. Under
 
 Kaufman,
 
 a company in a position to thwart or expose a breach of fiduciary duty may protect its interests by doing neither, sitting tight, and being quiet. No doubt, State Street was hoping to be replaced by a less cautious lender, and had no intention of precipitating its own loss, but silence and forbearance did not assist the fraud
 
 affirmatively.
 

 Finally, Sharp alleges that State Street participated in the Spitzes’ fraud by providing State Street’s contractually required consent:
 

 State Street further assisted the Spitzes’ breach of fiduciary duty by giving Sharp its express written consent to the Note-holders’ purchase of an additional $25 million of subordinated notes. At the time it gave this consent, State Street knew that the Noteholders were purchasing these notes in reliance on Sharp’s fraudulent representations concerning the accuracy of its financial statements. State Street further knew that its consent to the transaction was contractually required and that, absent its consent, the transaction would not be consummated.
 

 Compl. ¶ 53. States Street’s consent was not an inducement; it merely removed an impediment. Nor did the consent conceal the fraud.
 
 Kaufman,
 
 307 A.D.2d at 126, 760 N.Y.S.2d 157. The remaining question is whether that consent constituted “affirmative assistance.”
 

 State Street’s grant of consent can be characterized as affirmative: State Street was called upon to utter or write a consent without which Sharp could not have borrowed additional funds from the Notehold-ers. On the other hand, State Street’s consent was mere forbearance; it did no more than remove a contractual impediment that was reserved to State Street to invoke or not in its own interest. The existence of that right did not entail a duty to consider the interests of anyone else, and State Street’s exercise of that right to protect itself rather than its improvident competitors did not constitute participation in the Spitzes’ fraud.
 

 The nub of the complaint is that State Street knew that there would likely be victims of the Spitzes’ fraud, and arranged not to be among them. On the one hand, this seems repugnant; on the other hand, Loucks’s discovery that Sharp was rife with fraud was an asset of State Street, and State Street had a fiduciary duty to use that asset to protect its own shareholders, if it legally could. One could say that State Street failed to tell someone that his coat was on fire; or one could say that it simply grabbed a seat when it heard the music stop. The moral analysis contributes little.
 

 Whatever Loucks and State Street knew about the Spitzes’ fraud, they had come by that information through diligent inquiries that any other lender could have made.
 
 *53
 
 Sharp fails to identify any duty on State Street’s part to precipitate its own loss in order to protect lenders that were less diligent. All the allegations are in substance the same: that State Street was in a position to blow the whistle on the Spitzes’ fraud, but did not; instead, State Street arranged to extricate itself from the risk.
 

 B. Constructive Fraudulent Conveyance
 

 Sharp alleges that the company’s April 1998 payment of $12.25 million to State Street, in partial satisfaction of Sharp’s then outstanding debt, constituted a constructive fraudulent conveyance under certain provisions of the New York Uniform Fraudulent Conveyance Act, N.Y. Debt. & Cred. Law, §§ 272-75 (McKinney 2001) (“DCL”), New York’s version of the Uniform Fraudulent Conveyance Act (“UFCA”).
 

 “The UFCA identifies several situations involving ‘constructive fraud,’ in which a transfer made without fair consideration constitutes a fraudulent conveyance, regardless of the intent of the transferor.”
 
 HBE Leasing Corp, v. Frank,
 
 48 F.3d 623, 633 (2d Cir.1995)
 
 (“HBE Leasing
 
 I”). Under the DCL, a conveyance by a debtor is deemed constructively fraudulent if it is made without “fair consideration,” and
 
 (inter
 
 alia) if one of the following conditions is met: (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275. (The provisions and definitions are set out in the margin.
 
 [3]
 
 )
 

 Sharp fails adequately to allege a lack of “fair consideration.”
 
 See Atlanta Shipping Corp., Inc. v. Chem. Bank,
 
 818 F.2d 240, 248 (2d Cir.1987) (“An essential element of a claim pursuant to DCL §§ 273, 273-a, 274, 275 is lack of fair consideration.”).
 

 The fair consideration test “is profitably analyzed as follows: (1) ... the recipient of the debtor’s property[ ] must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and (2) such exchange must be a ‘fair equivalent’ of the property received; and (3) such exchange must be ‘in good faith.’ ”
 
 *54
 

 HBE Leasing Corp. v. Frank,
 
 61 F.3d 1054, 1058-59 (2d Cir.1995)
 
 (“HBE Leasing II
 
 ”) (emphasis omitted);
 
 see also Ede v. Ede,
 
 193 A.D.2d 940, 941-42, 598 N.Y.S.2d 90, 92 (3d Dep’t 1993) (“[F]air consideration requires that the exchange not only be for equivalent value, but also that the conveyance be made in good faith.”).
 

 Sharp acknowledges that the payment at issue discharged an antecedent debt and was made for a “fair equivalent”; but contends that fair consideration is lacking because State Street did not receive the payment in “good faith.”
 
 [4]
 

 Good faith is an elusive concept in New York’s constructive fraud statute. It is hard to locate that concept in a statute in which “the issue of intent is irrelevant.”
 
 United States v. McCombs,
 
 30 F.3d 310, 326 n. 1 (2d Cir.1994);
 
 see also HBE Leasing I,
 
 48 F.3d at 633 (“[A] transfer made without fair consideration constitutes a fraudulent conveyance, regardless of the intent of the transferor.”). Moreover, bad faith does not appear to be an articulable exception to the broad principle that “the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property.”
 
 Pashaian v. Eccelston Props.,
 
 88 F.3d 77, 85 (2d Cir.1996).
 

 One exception has been recognized by the New York courts to the rule that the repayment of an antecedent debt constitutes fair consideration: where “the transferee is an officer, director, or major shareholder of the transferor.”
 
 Atlanta Shipping,
 
 818 F.2d at 249;
 
 see also HBE Leasing I,
 
 48 F.3d at 634 (“New York courts have carved out one exception to the rule that preferential payments of preexisting obligations are not fraudulent conveyances: preferences to a debtor corporation’s shareholders, officers, or directors are deemed not to be transfers for fair consideration.”).
 

 The only case found by us or the parties in which an (allegedly) antecedent debt paid to an
 
 outsider
 
 was found lacking in fair consideration is one in which the debt- or affirmatively swore that the transaction was intended to evade his creditors.
 
 See Ede,
 
 193 A.D.2d at 942, 598 N.Y.S.2d 90 (holding that fair consideration was lacking in the face of evidence “which can admit of no finding other than ... bad faith”). But a case such as
 
 Ede
 
 does not furnish a rule of decision for detecting what constitutes bad faith.
 

 The decisive principle in this case is that a mere preference between creditors does not constitute bad faith:
 

 [Ejven the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because “[t]he basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy
 
 some
 
 of his creditors; it normally does not try to choose among them.”
 

 HBE Leasing I,
 
 48 F.3d at 634 (quoting
 
 Boston Trading Group, Inc. v. Burnazos,
 
 835 F.2d 1504, 1509 (1st Cir.1987)). Nor does it matter that the preferred creditor knows that the debtor is insolvent:
 

 [A] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another. It is of no significance that the transferee has knowledge of such insolvency. Nor is the transfer subject to attack by reason of knowledge on the part of the transferee that the transferor is preferring him to
 
 *55
 
 other creditors, even by virtue of a secret agreement to that effect.
 

 Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.,
 
 191 A.D.2d 86, 90-91, 599 N.Y.S.2d 816 (1st Dep’t 1993) (internal citations and quotation marks omitted).
 

 Here, the payment was on account of an antecedent debt, was made to an outsider, and there is no admission of subjective bad faith (if indeed that would matter). Sharp argues, however, that it has alleged more than a mere preference, or knowledge of the debtor’s insolvency, because it alleges that State Street knew that the funds used to repay the State Street debt were fraudulently obtained. This argument is unpersuasive. We adopt — as did the district court — the First Circuit’s conclusion in
 
 Boston Trading,
 
 that a lack of good faith “does not ordinarily refer to the transferee’s knowledge of the source of the debt- or’s monies which the debtor obtained at the expense of other creditors.” 835 F.2d at 1512 (emphasis omitted). As the
 
 Boston Trading
 
 Court explained,
 

 [t]o find a lack of “good faith” where the transferee does not participate in, but only knows that the debtor created the other debt through some form of[ ] dishonesty is to void the transaction because it amounts to a kind of “preference” — concededly a most undesirable kind of preference, one in which the claims of alternative creditors differ considerably in their moral worth, but a kind of preference nonetheless.
 

 Id.
 

 Our adoption of the First Circuit’s rule is consistent with New York’s policy in favor of national uniformity in UFCA law.
 
 See HBE Leasing I,
 
 48 F.3d at 634 n. 8 (“In order to promote a uniform national interpretation of the UFCA, both this Circuit and the courts of New York have encouraged recourse to the case law of other jurisdictions.”) This ruling is not, as Sharp suggests, inconsistent with our observation in
 
 HBE Leasing I
 
 that “the statutory requirement of ‘good faith’ is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme.” 48 F.3d at 636.
 

 HBE Leasing I
 
 concerned the “collapsing” of contemporaneous transactions coordinated to shield an insolvent debtor’s assets from bona fide creditors.
 
 Id. HBE Leasing I
 
 held that “multiple transactions may be collapsed and treated as phases of single transaction where (1) consideration received in exchange for [the] initial transfer of [the] debtor’s property is reconveyed by [the] debtor for less than fair consideration or with fraudulent intent, and (2)[the] transferee of [the] initial conveyance has actual or constructive knowledge of [the] scheme.”
 
 HBE Leasing II,
 
 61 F.3d at 1062 (stating the holding of
 
 HBE Leasing I); see also Orr v. Kinderhill Corp.,
 
 991 F.2d 31, 35 (2d Cir.1993) (this Court “will not turn a blind eye to the reality that” two conveyances “constituted a single, integrated transaction”). In
 
 HBE Leasing I,
 
 the original lender knew when it extended the credit to the borrower that the funds advanced might not be used for legitimate corporate purposes, and that knowledge was held to be sufficient notice that the debtor “might improperly funnel” the proceeds “to third parties.”
 
 HBE Leasing I,
 
 48 F.3d at 637. This rule has no applicability where, as here, it is undisputed that State Street’s loan was made in good faith long before the purportedly fraudulent transfer. No ground exists therefore to “collapse” that loan into other (non-contemporaneous) bad-faith maneuvers.
 

 Sharp has alleged State Street’s knowledge that the funds used to repay the preexisting debt were fraudulently obtained. New York fraudulent conveyance law, however, is primarily concerned with
 
 *56
 
 transactions that shield company assets from creditors, not the manner in which specific debts were created,
 
 see Boston Trading,
 
 835 F.2d at 1510; State Street’s knowledge of the Spitzes’ fraud, without more, does not allow an inference that State Street received the $12.25 million payment in bad faith.
 
 Cf Ede,
 
 193 A.D.2d at 942, 598 N.Y.S.2d 90 (holding that fair consideration was lacking in the face of evidence “which can admit of no finding other than ... bad faith”).
 

 C. Intentional Fraudulent Conveyance
 

 Sharp alleges that Sharp’s $12.25 million payment to State Street is voidable as an intentional fraudulent conveyance. Pursuant to DCL § 276:
 

 Every conveyance made ... with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.
 

 “[T]o prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor.”
 
 HBE Leasing II,
 
 61 F.3d at 1059 n. 5. “[W]here actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given.”
 
 McCombs,
 
 30 F.3d at 328. As “actual intent to hinder, delay, or defraud” constitutes fraud,
 
 Atlanta Shipping,
 
 818 F.2d at 251, it must be pled with specificity, as required by Fed.R.Civ.P. 9(b). Moreover, “[t]he burden of proving ‘actual intent’ is on the party seeking to set aside the conveyance.”
 
 McCombs,
 
 30 F.3d at 328.
 

 “Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on ‘badges of fraud’ to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent.”
 
 Wall St. Assocs. v. Brodsky,
 
 257 A.D.2d 526, 529, 684 N.Y.S.2d 244, 247 (1st Dep’t 1999) (internal citations and quotation marks omitted). These “badges of fraud” may include
 
 (inter
 
 alia): “a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; ... and retention of control of the property by the transferor after the conveyance.”
 
 Id.; see also HBE Leasing I,
 
 48 F.3d at 639 (“Actual fraudulent intent ... may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction.”);
 
 In re Kaiser,
 
 722 F.2d 1574, 1582-83 (2d Cir.1983).
 

 Sharp argues that the district court inappropriately focused on “badges of fraud” even though the Spitzes’ fraud was so clearly established that it need not be detected by indicia. However, the intentional fraudulent conveyance claims fails for the independent reason that Sharp inadequately alleges fraud with respect to the transaction that Sharp seeks to void,
 
 i.e.,
 
 Sharp’s $12.25 million payment to State Street.
 
 See Boston Trading,
 
 835 F.2d at 1510 (“Fraudulent conveyance law is basically concerned with transfers that ‘hinder, delay or defraud’ creditors; it is not ordinarily concerned with how such debts were created.”) (emphasis omitted).
 

 The fraud alleged in the complaint relates to the manner in which Sharp obtained new funding from the Noteholders, not Sharp’s subsequent payment of part of the proceeds to State Street. The $12.25 million payment was at most a preference between creditors and did not “hinder, delay, or defraud either present or future creditors.” DCL § 276;
 
 cf. HBE Leasing I,
 
 48 F.3d at 640 (actual intent ade
 
 *57
 
 quately alleged where the payment in question “effectively transferred substantial assets from the corporation to [insiders]” with the potential intent of defrauding future judgment creditors).
 

 For the forgoing reasons, the judgment of dismissal is affirmed.
 

 [1]
 

 . On April 14, 2003, while Sharp’s appeal of the bankruptcy court’s ruling was pending in the Eastern District, the New York Supreme Court dismissed the Noteholders' suit against
 
 *49
 
 State Street, on a motion for summary judgment, noting that "[discovery in this action has not revealed any conduct by [State Street] more serious than that alleged in [Sharp's] adversary proceeding.”
 
 Albion,
 
 slip op. at 14. On December 4, 2003, the First Department "unanimously affirmed” that ruling, "for the reasons stated by” the New York Supreme Court.
 
 Albion Alliance Mezzanine Fund, L.P. v. State Street Bank & Trust Co.,
 
 2 A.D.3d 162, 767 N.Y.S.2d 619 (1st Dep’t 2003).
 

 [2]
 

 . State Street had no affirmative duty under New York law to inform Sharp, Sharp’s existing creditors, or Sharp's prospective creditors of the Spitzes’ fraud.
 
 See Bank Leumi Trust Co. v. Block 3102 Corp.,
 
 180 A.D.2d 588, 589, 580 N.Y.S.2d 299, 301 (1st Dep’t 1992) ("The legal relationship between a borrower and a bank is a contractual one of debtor and creditor and does not create a fiduciary relationship between the bank and its borrower
 

 [3]
 

 . DCL § 272 provides that: “Fair consideration is given for property, or obligation.
 

 a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
 

 b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.”
 

 DCL § 273 provides that: "Evety conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.”
 

 DCL § 274 provides that: "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.”
 

 DCL § 275 provides that: "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.”
 

 [4]
 

 . “Good faith” in a constructive fraudulent conveyance claim "is the good faith of the transferee.”
 
 HBE Leasing II,
 
 61 F.3d at 1059 n. 5.