### In re BERNARD L. MADOFF INVESTMENT SECURITIES LLC, Debtor.

Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, Plaintiff,

v.

J. Ezra Merkin, Gabriel Capital, L.P., Ariel Fund Ltd., Ascot Partners, L.P., Gabriel Capital Corporation, Defendants.

Bankruptcy No. 08–01789 (BRL).

Adversary No. 09–1182 (BRL).

United States Bankruptcy Court, S.D. New York.

Nov. 17, 2010.

Baker & Hostetler LLP, New York, NY, by David J. Sheehan, Marc E. Hirschfield, Marc D. Powers, for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff.

Dechert LLP, New York, NY, by Andrew J. Levander, Neil A. Steiner, Dechert LLP, Washington, D.C., by Steven A. Engel, for J. Ezra Merkin and Gabriel Capital Corporation.

Reed Smith LLP, New York, NY, by James C. McCarroll, Lance Gotthoffer, for Bart M. Schwartz, Receiver of Gabriel Capital, L.P. and Ariel Fund Limited.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS TRUSTEE'S COMPLAINT

BURTON R. LIFLAND, Bankruptcy Judge.

Before this Court are the motions (the "Motions to Dismiss") of (1) J. Ezra Mer-

kin ("Merkin") and Gabriel Capital Corporation ("GCC," and together with Merkin, the "Merkin Defendants"), and (2) Ariel Fund Limited ("Ariel") and Gabriel Capital, L.P. ("Gabriel," and together with Ariel, the "Fund Defendants" or the "Funds") (collectively, the "Moving Defendants") seeking to dismiss the second amended complaint (the "Complaint") of Irving H. Picard, Esq. (the "Trustee" or "Plaintiff"), trustee for the substantively consolidated Securities Investor Protection Act[1] ("SIPA") liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), filed pursuant to SIPA sections 78fff(b) and 78fff-2(c)(3), sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a) and 551 of the Bankruptcy Code (the "Code"), various sections of New York Debtor and Creditor Law[2] (the "NYDCL") and other applicable law for turnover, accounting, preferences, fraudulent conveyances, damages, and objections to SIPA claims.

The Moving Defendants assert that the Complaint fails to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), made applicable herein by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7012, and should be dismissed in its entirety.

For the reasons set forth below and at oral argument, the Motions to Dismiss are GRANTED in part and DENIED in part. Specifically, the Motions to Dismiss are GRANTED with respect to Counts One and Two of the Complaint, seeking immediate turnover under section 542 of the

Code and avoidance of preferential transfers under section 547(b) of the Code, respectively. The Motions to Dismiss all remaining counts of the Complaint are DENIED.

### BACKGROUND [3]

The Complaint arises in connection with the infamous Ponzi scheme perpetrated by Bernard L. Madoff for decades through his investment company, BLMIS. As recognized by the Securities Investor Protection Corporation ("SIPC"), "this is not a typical SIPC proceeding in which securities or cash were on hand at the time of the failure of the brokerage house." Letter from Stephen P. Harbeck, President of SIPC to the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises at p. 6 (dated Sept. 7, 2010) [hereinafter "SIPC Letter"]. Rather, it was a fraud of unparalleled magnitude "in which the only assets were other people's money or assets derived from such funds." *Id.* During the course of this fraud, there were approximately 90,000 disbursements of fictitious profits to Madoff investors totaling $18.5 billion. *Id.* at p. 5. Due to the longstanding nature of the Ponzi scheme, many of the customer accounts presented multiple generational investments, requiring the Trustee to conduct a full forensic analysis of all of BLMIS's books and records, dating back to at least the early 1980s. *Id.* at p. 7. As of November 12, 2010, the Trustee has determined 14,769 claims, denied 2,752 claims, and allowed 2,291 claims in the amount of $5,739,853,405.38. Moreover,

---

**1.** 15 U.S.C. § 78aaa *et seq.* Hereinafter, "SIPA" shall replace "15 U.S.C." in reference to SIPA sections.

**2.** N.Y. Debt & Cred. Law § 270 *et seq.* (McKinney 2001).

**3.** A comprehensive discussion of the facts underlying this SIPA liquidation and Madoff's notorious Ponzi scheme is set forth in this Court's March 1, 2010 net equity decision. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 125–33 (Bankr. S.D.N.Y.2010).

SIPC has committed $743,928,341.68 in SIPC advances to these claimants. *See* http://www.madofftrustee.com (last visited Nov. 16, 2010). The Trustee has reviewed, and continues to review, millions of documents to determine the thousands of customer claims filed in this SIPA liquidation. SIPC Letter at p. 7.

The Trustee has filed 19 complaints thus far, seeking to recover, in the aggregate, approximately $15 billion. *Id.* at p. 5. In the instant Complaint, the Trustee is seeking to recover transfers in the collective amount of over $490 million.

## I. Events Preceding the Complaint

On December 11, 2008 (the "Filing Date"),[4] Madoff was arrested by federal agents and charged with securities fraud in violation of SIPA sections 78j(b) and 78ff, and 17 C.F.R. section 240.10b–5 in the United States District Court for the Southern District of New York (the "District Court"). *United States v. Madoff,* No. 08–MJ–02735, 2008 WL 5197082 (S.D.N.Y. filed Dec. 11, 2008). That same day, the Securities and Exchange Commission (the "SEC") filed a civil complaint in the District Court, alleging, *inter alia,* that Madoff and BLMIS were operating a Ponzi scheme through BLMIS's investment advisor activities. *S.E.C. v. Madoff, et al.,* No. 08–CV–10791 (S.D.N.Y. filed Dec. 11, 2008) (the "Civil Action").

On December 15, 2008, SIPC filed an application in the Civil Action seeking a decree that the customers of BLMIS are in need of the protections afforded under SIPA. The District Court granted SIPC's application and entered an order on December 15, 2008, placing BLMIS's customers under the protections of SIPA (the "Protective Order"). The Protective Order appointed Plaintiff as trustee for the liquidation of the business of BLMIS and removed the SIPA liquidation proceeding to this Court pursuant to SIPA section 78eee(b)(3) and (b)(4), respectively.

On March 12, 2009, Madoff pled guilty to an 11–count criminal indictment filed against him and admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Transcript of Plea Hearing at 23:14–17, *United States v. Madoff,* No. 09–CR–213 (DC) (Dkt. No. 57). On June 29, 2009, Madoff was sentenced to 150 years in prison.

## II. The Ponzi Scheme

BLMIS was a New York limited liability company registered with the SEC as a securities broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o* (b). It was run by its founder, chairman and chief executive officer, Madoff, with several family members and a number of additional employees. BLMIS had three business units: investment advisory (the "IA Business"), market making, and proprietary trading.

Madoff's fraudulent activity was perpetrated though BLMIS's IA Business. To facilitate his fraud, Madoff would generate customer account statements purportedly showing securities that either were held or had been traded, as well as the gains and losses in those accounts. However, as Madoff admitted at his plea hearing, none of the purported purchases of securities in the BLMIS customer accounts had actually occurred, and the reported gains were entirely fictitious. This has been confirmed by the Trustee's investigation, which reveals that with the exception of isolated individual trades, there is no record of BLMIS having cleared any purchase or sale of securities in the Depository Trust & Clearing Corporation.

---

4. *See* SIPA § 78*lll* (7)(B) (defining the "Filing Date").

Accordingly, the money Madoff received from his investors was not used to buy any securities; rather, it was used to pay other investors when requests for distribution of "profits" were made. Thus, any payment of "profit" to a BLMIS customer came from another BLMIS customer's initial investment. Ultimately, the requests for payments exceeded the inflow of new investments, resulting in the eventual collapse of the Ponzi scheme.

## III. The Defendants

Merkin is a sophisticated investment manager who, individually or through his company, GCC, managed several investment funds, which, from at least 1995 through 2008, collectively withdrew more than $500 million from BLMIS prior to the collapse of Madoff's scheme. In connection with the management of these investments, Merkin, either individually or through GCC, earned substantial commissions and performance fees. Merkin is the sole shareholder and sole director of GCC, a corporation organized under the laws of Delaware with a principal place of business at 450 Park Avenue, # 3201, New York, New York 10022. The Trustee alleges that Merkin completely dominated GCC in dealing with BLMIS, using GCC as a mere instrument to facilitate Merkin's personal interests, rather than any corporate ends. As a result, GCC functioned as the alter ego of Merkin, such that no corporate veil could be maintained between them.

Merkin was also the sole general partner of Gabriel, a limited partnership organized under the laws of Delaware with a principal place of business at 450 Park Avenue, # 3201, New York, New York 10022. At all relevant times, Merkin's company, GCC, was the investment advisor to Ariel, a mutual fund organized under the Mutual Funds Law of the Cayman Islands with a principal place of business in New York, New York. Ariel and Gabriel executed a Customer Agreement, an Option Agreement and a Trading Authorization Limited to Purchases and Sales of Securities and Options (the "Account Agreements") in opening their BLMIS accounts.

Merkin was also the sole general partner of Ascot Partners, L.P. ("Ascot," and together with the Moving Defendants, the "Defendants"), a limited partnership organized under the laws of Delaware with a principal place of business at 450 Park Avenue, # 3201, New York, New York 10022. Ascot includes the former Ascot Fund, Ltd., which was merged into Ascot in early 2003. Like Ariel and Gabriel, Ascot also executed the Account Agreements. Ascot is insolvent and its assets are insufficient to satisfy any potential judgment on the claims asserted in the Complaint. Although a defendant to the Complaint, Ascot has not answered or moved as of the date of this decision due to ongoing settlement discussions with the Trustee.[5] Accordingly, the merits of the Trustee's claims against Ascot will not be addressed at this time.

## IV. The Complaint

The Complaint, filed by the Trustee on December 23, 2009, seeks to avoid and recover preferential and fraudulent transfers made to or for the benefit of the Defendants as initial or subsequent transferees pursuant to sections 544, 547, 548, 550, and 551 of the Code, and various sections of the NYDCL.[6] In addition, the

---

5. Pursuant to a Stipulation and Order filed on October 14, 2010, Ascot may move, answer or otherwise respond to the Complaint up to and including December 17, 2010 (Dkt. No. 83).

6. In a SIPA liquidation, a SIPA trustee may utilize the avoidance powers enjoyed by a bankruptcy Trustee. *See* SIPA §§ 78fff(b), 78fff–2(c)(3).

Complaint seeks recovery of certain transfers under state partnership law from Merkin as general partner of Ascot with legal liability for Ascot's obligations. Further, the Trustee objects to the Defendants' SIPA claims, which he asserts should be disallowed under section 502(d) of the Code. Finally, the Trustee seeks turnover and accounting under section 542 of the Code and SIPA section 78fff–2(c)(3).

The following facts alleged in the Complaint, presented in the light most favorable to the Trustee, are assumed to be true for purposes of these Motions to Dismiss. Prior to 1995, Ariel, Gabriel and Ascot began investing heavily with BLMIS. Between December 1, 1995 and the Filing Date, the Defendants collectively invested over one billion dollars with BLMIS through 56 separate wire transfers directly into BLMIS's account at JPMorgan Chase & Co. ("JPMorgan").

The Complaint alleges that at least eleven transfers totaling $494.6 million were made from BLMIS to or for the benefit of the Defendants within six years prior to the Filing Date (the "Initial Transfers"). Of the Initial Transfers, at least six totaling $313.6 million were made within two years prior to the Filing Date, and one totaling $45 million, subject to a credit of $10 million, was made to Ascot within ninety days of the Filing Date.[7] The particular details of these transactions from BLMIS to Ariel, Gabriel and Ascot as initial transferees—including the date, transferor, transferee, and amount transferred—are highlighted in Exhibit B to the Complaint. Compl. at ¶¶ 48–50, Ex. B. The Trustee also seeks recovery from the Merkin Defendants, who are alleged to have received, directly or indirectly, some or all of the Initial Transfers as subsequent transferees. In particular, the Complaint provides that the Merkin Defendants were paid a percentage of the value of Ariel, Gabriel and Ascot each year as fees and commissions for managing, operating, and providing investment services (the "Subsequent Transfers").

The Trustee alleges that the Defendants, independently or through Merkin, were on notice of certain "red flags" indicating fraudulent activity, failed to exercise due diligence, and knew or should have known that they were profiting from a fraudulent scheme. In support, the Trustee alleges that the Defendants were on notice of, *inter alia*, the following indicia of irregularity and fraud, but failed to make sufficient inquiry: (1) from at least 1995 through 2008, Ariel, Gabriel and Ascot received unrealistically high and consistent annual returns of between 11% to 16%, in contrast to the vastly larger fluctuations in the Standard & Poor 100 Index upon which Madoff's trading activity was supposedly based during that period of time;[8] (2) the Defendants' account statements reflected hundreds of trades exercised at prices outside the daily range possible for those securities;[9] (3) the Defendants mis-

---

7. In Count Two of the Complaint, the Trustee concedes that his preference claim under section 547(b) of the Code is directed solely against Ascot. Compl. at ¶¶ 57–66. Accordingly, Count Two is dismissed as to all of the Moving Defendants. Moreover, the merits of the Trustee's preference claim against Ascot will not be addressed at this time. However, the Trustee has alleged that Merkin is personally liable, as general partner of Ascot, for any potential judgment on the claims against As-

cot. Compl. at ¶¶ 37, 43, 110–13; *infra* at Section IV.

8. For example, there were only 4 months when the Fund Defendants received negative returns during the 100 months of reported operations from August 2000 through November 2008, when the Fund Defendants were customers of BLMIS. Compl. at ¶ 44(e).

9. For example, Defendants' December 2006 account statements reported sales of 169,224

led investors as to Madoff's role in operating their BLMIS accounts and sought to conceal that role; (4) Merkin was warned by a number of Wall Street professionals, an accountant at GCC, and Victor Teicher, account manager for certain of the funds for a number of years, that BLMIS appeared to be fraudulent and its results were impossibly consistent; (5) Defendants received financial industry press reports questioning the legitimacy of BLMIS and Madoff and their ability to achieve promised consistent returns; (6) Merkin had an unusually close business and social relationship with Madoff, including sitting together on the Board of Trustees of Yeshiva University, and, as a result, intimate access to BLMIS; (7) BLMIS lacked transparency to investors, regulators, and other outside parties by failing to provide customers with real-time online access to their accounts and excluding an independent custodian of securities; and (8) BLMIS, one of the world's largest hedge funds, was supposedly audited by Friehling & Horowitz, an accounting firm with only three employees, one of whom was semi-retired, with offices located in a strip mall.[10] Compl. at ¶ 44(a)–(t).

The Trustee asserts that the Complaint is replete with allegations of bad faith against both sets of Moving Defendants. Additionally, the Trustee argues that Merkin's knowledge and lack of good faith is imputed to the Fund Defendants by virtue of an agency relationship. Merkin was the sole general partner of Gabriel and Ascot, and investment advisor to Ariel. Merkin, individually and through GCC, made all management, operations, and investment decisions for the Fund Defendants, with ultimate authority to act on their behalf.

Moreover, the Trustee contends that as sole general partner of Ascot with ultimate responsibility for its operations, management, and investment decisions, Merkin is personally liable under state law for any fraudulent or preferential transfers received by the Ascot partnership. Thus, any judgment against Ascot to recover BLMIS transfers can be enforced against Merkin individually.

### STANDARD OF REVIEW—MOTION TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) allows a party to move to dismiss a cause of action for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *E.E.O.C. v. Staten Island Sav. Bank,* 207 F.3d 144, 148 (2d Cir.2000).

To survive a motion to dismiss, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). However, a recitation of the elements of

---

shares, 21,315 shares and 27,191 shares of Merck, each of which was purportedly executed at a price of $44.61 on the trade date of December 22, 2006, with a *settlement date* of December 28, 2006. The daily price for Merck stock on December 22, 2006 ranged from a low of $42.78 to a high of $43.42, more than $1 below the price reported on the statements. Compl. at ¶ 44(g).

**10.** David Friehling is the subject of a criminal information filed by the United States alleging, *inter alia,* securities fraud. *See* Friehling Information, *United States v. Friehling,* No. 09–CR–0700 (AKH) (S.D.N.Y. July 17, 2009) (Dkt. No. 14). He has since pled guilty, and sentencing is scheduled for March 18, 2011. *Id.* at Dkt. No. 43.

the cause of action, supported by mere conclusory statements, is insufficient. *Iqbal*, 129 S.Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Rather, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950. A claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. In determining plausibility, this Court must "draw on its judicial experience and common sense," *id.* at 1950, to decide whether the factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

In contrast, allegations of fraud are held to the higher pleading standard of Rule 9(b), requiring a party to "state with particularity the circumstances constituting fraud." FED.R.CIV.P. 9(b); FED. R. BANKR.P. 7009(b). Rule 9(b) permits, however, that "[m]alice, intent, knowledge, and other conditions of a person's mind" be pled generally. FED.R.CIV.P. 9(b). In applying this heightened pleading requirement where applicable, this Court is mindful of the vastness and complexity of the Trustee's investigation of the Madoff Ponzi scheme, and the disadvantage the Trustee faces in pleading fraud against multiple defendants. It has been held that courts will take a "liberal" approach in construing allegations of actual fraud asserted by a bankruptcy trustee on behalf of all creditors of an estate. *Pereira v. Grecogas Ltd., et al. (In re Saba Enters., Inc.)*, 421 B.R. 626, 640 (Bankr.S.D.N.Y.2009); *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 505 (Bankr.S.D.N.Y.2002), *leave to appeal denied by* 288 B.R. 52 (S.D.N.Y.2002). Courts have found that "[g]reater liberali-

ty in the pleading of fraud is particularly appropriate in bankruptcy cases, because . . . it is often the trustee, a third party outsider to the fraudulent transaction, that must plead the fraud on secondhand knowledge for the benefit of the estate and all of its creditors." *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr.S.D.N.Y.1999) (citing *Atlanta Shipping Corp., Inc. v. Chem. Bank*, 631 F.Supp. 335, 348 (S.D.N.Y.1986), *aff'd* 818 F.2d 240 (2d Cir.1987)). Consistent with the foregoing, as the Trustee is pleading from second-hand knowledge, "allegations of circumstantial evidence are sufficient to establish fraudulent intent." *In re Saba Enters., Inc.*, 421 B.R. at 643. Moreover, as "the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time, the trustee's handicap increases," and he should therefore be afforded "even greater latitude." *Stratton Oakmont, Inc.*, 234 B.R. at 310 (citing *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97–CIV–4978 (LMM), 1998 WL 159059, at *6 (S.D.N.Y. Apr.1, 1998)).

## DISCUSSION

### I. THE TRUSTEE'S CAUSES OF ACTION TO RECOVER ACTUAL FRAUDULENT TRANSFERS UNDER THE CODE AND THE NYDCL ARE SUFFICIENTLY PLED

To adequately plead a claim to recover actual fraudulent transfers under the Code and the NYDCL, the Complaint must state with particularity the factual circumstances constituting fraud under Rule 9(b). *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F.Supp.2d 79, 106–07 (S.D.N.Y.2004) (applying the pleading requirements of Rule 9(b) to actual fraud claims under both the Code and NYDCL). To do this, the Complaint must allege "(1) the property subject

to the transfer, (2) the timing and, if applicable, frequency of the transfer and (3) the consideration paid with respect thereto." *In re Saba Enters., Inc.*, 421 B.R. at 640. In contrast, fraudulent intent may be pled generally under Rule 9(b). FED.R.CIV.P. 9(b). Under the Code, the trustee must show such intent on the part of the debtor-transferor. 11 U.S.C. § 548(a)(1)(A) (requiring a showing by the trustee that *"the debtor . . . made such transfer . . . with actual intent to hinder, delay, or defraud."*) (emphasis added). Under the NYDCL, as discussed below, courts differ as to whether the Trustee must also show fraudulent intent on the part of the transferee. *See* NYDCL § 276 (allowing the trustee to avoid any "conveyance made . . . with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors").

## A. The Trustee's Claims for Actual Fraud Under Sections 548(a)(1)(A), 550 and 551 of the Code are Sufficiently Pled

The Trustee has sufficiently pled Count Three of the Complaint to avoid and recover actual fraudulent transfers pursuant to sections 548(a)(1)(A), 550 and 551 of the Code. As a preliminary matter, for the reasons set forth in Section I, B, this Court finds that the Trustee has pled the transfers sought to be avoided with particularity in accordance with Rule 9(b).[11]

▮ Further, as the Moving Defendants concede, the Complaint adequately alleges the debtor's fraudulent intent for purposes of section 548(a)(1)(A) of the Code. It is now well recognized that the existence of a Ponzi scheme establishes that transfers were made with the intent to hinder, delay

and defraud creditors. *See, e.g., In re Bayou Group, LLC,* Nos. 06–22306(ASH), *et al.,* 2010 WL 3839277, at *15, n. 19 (S.D.N.Y. Sept.17, 2010) ("[W]here a Ponzi scheme exists, there is a presumption that transfers were made with the intent to hinder, delay and defraud creditors."); *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.),* 397 B.R. 1, 8 (S.D.N.Y.2007) ("[T]ransfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors.") (internal quotations omitted); *Quilling v. Stark,* No. 05–CV–1976 (L), 2006 WL 1683442, at *6 (N.D.Tex. June 19, 2006) ("The existence of a *Ponzi* scheme as alleged in the complaint makes the transfer of investor funds fraudulent as a matter of law."). The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts of this case. Accordingly, the debtor's fraudulent intent has been adequately pled for purposes of actual fraud under the Code.

As the Moving Defendants cannot reasonably dispute the debtor's fraudulent intent, they seek to dismiss the Trustee's Code-based actual fraud claims by invoking the "good faith transferee defense" of section 548(c) of the Code. Pursuant to this provision, "a transferee . . . that takes for value and in good faith . . . may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer." 11 U.S.C. § 548(c). The Moving Defendants argue that the Complaint "leaves no 'plausible' basis for disputing the Funds' defenses under section 548(c)" as good faith transferees. Merkin Mem. Law at p. 15;[12]

---

**11.** Count Three (actual fraud under the Code) has been adequately pled against all of the Moving Defendants, despite that the Merkin Defendants are alleged to have received the

Initial Transfers only as subsequent transferees. *See infra* at Section V.

**12.** Memorandum of Law in Support of Defendants J. Ezra Merkin's and Gabriel Capital

*see also* Fund Mem. Law at pp. 13–17.[13]

 Contrary to the Moving Defendants' argument, a trustee need not dispute a transferee's good faith defense upon the face of the Complaint. *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 639 (Bankr.S.D.N.Y.2007) ("[L]ack of good faith is not an element of a plaintiff's claim under Section 548(a)(1)."). Rather, the transferee bears the burden of establishing its good faith under section 548(c) of the Code as an *affirmative defense* that "may be raised and proved by the transferee at trial." *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 508 (Bankr.S.D.N.Y. 2002). Given that a defendant carries the burden of proving an affirmative defense, "[a] motion to dismiss is usually not the appropriate vehicle to raise affirmative defenses." *Ortiz v. Guitian Music Bros., Inc.*, No. 07–CIV–3897, 2009 WL 2252107, at *2 (S.D.N.Y. July 28, 2009). As such, the Moving Defendants' arguments under section 548(c) of the Code are irrelevant to the Trustee's pleading requirements, and thus ineffective in dismissing the Trustee's Code-based actual fraud claims.

 The Moving Defendants further contend that if section 548(c) of the Code indeed constitutes an affirmative defense, it should nevertheless be considered at this early stage of the proceedings because it has been established on the face of the Complaint itself. The Moving Defendants' argument relies upon a limited exception to the general rule, which provides that a litigant can "plead itself out of court by unintentionally alleging facts (taken as true) that establish an affirmative defense." *Levine v. AtriCure, Inc.*, 594 F.Supp.2d 471, 474 (S.D.N.Y.2009). This doctrine is inapplicable here, as the Complaint is replete with contrary allegations that the Moving Defendants accepted the Initial Transfers in *bad faith*, with actual and constructive knowledge of the fraud. In addition, this doctrine has been applied to dismiss complaints establishing only clear-cut, complete affirmative defenses such as absolute immunity or the statute of limitations; "defenses that require a factual review to be established . . . should not support a dismissal." 2 Moore's Fed. Prac. § 12.34[4][b], at 100 (3d ed. 2010).[14] The element of good faith under section 548(c) of the Code, bearing upon a transferee's motivations, is "indisputably a factual question" that "may not be determined on the face of [a] complaint." *La Vigna v. Lipshie (In re Wise)*, 173 B.R. 75, 78–79 (Bankr.E.D.N.Y.1994); *see Golden Budha Corp. v. Canadian Land Co. of Am., N.V.*, 931 F.2d 196, 201–02 (2d Cir. 1991) ("Ordinarily, the issue of fraudulent intent . . . [is] a factual question involving the parties' states of mind."). According-

Corporation's Motion to Dismiss Plaintiff's Second Amended Complaint (Dkt. No. 54) [hereinafter "Merkin Mem. Law"].

**13.** Corrected Memorandum of Law in Support of Motion by Defendants Ariel Fund Limited and Gabriel Capital, L.P. to Dismiss the Second Amended Complaint (Dkt. No. 59) [hereinafter "Fund Mem. Law"].

**14.** Moreover, the section 548(c) defense should not support dismissal because, by its terms, it does not operate as a complete bar to a claim. Affirmative defenses permitting

dismissal must "bar the award of any remedy." 5B Wright & Miller, *Fed. Prac. & Proc. Civ.* § 1357 (3d ed. 2010); *Flight Sys., Inc. v. Elec. Data Sys. Corp.*, 112 F.3d 124, 127 (3d Cir.1997) (finding that affirmative defense must present an insuperable barrier to recovery by plaintiff). By contrast, even when proven by the transferee at the proper stage of the litigation, the 548(c) defense entitles a good faith transferee to retain his interest only *"to the extent that* such transferee . . . gave value." 11 U.S.C. § 548(c) (emphasis added).

ly, whether the Moving Defendants acted in good faith when they allegedly accepted hundreds of millions of dollars in transfers of BLMIS funds is a disputed issue that this Court can properly determine only upon consideration of all of the relevant evidence obtained through the discovery process.

### B. The Trustee Has Sufficiently Alleged Actual Fraud Under the NYDCL

The Trustee has sufficiently pled Count Five of the Complaint under sections 276, 276-a, 278 and/or 279 of the NYDCL, and pursuant to sections 544, 550(a) and 551 of the Code to avoid and recover actual fraudulent transfers made within six years of the Filing Date.

Section 276 of the NYDCL allows the Trustee to avoid any "conveyance made . . . with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors." NYDCL § 276. As discussed above, the debtor's fraudulent intent is established by virtue of the Ponzi scheme presumption. *See supra* at Section I, A. Under New York's actual fraudulent transfer statute, unlike under section 548(a)(1)(A) of the Code, courts differ as to whether a trustee must also plead a *transferee's* fraudulent intent. While some courts have held that section 276 requires a plaintiff to show intent to "hinder, delay, or defraud" simply on the part of the transferor, *see, e.g., Sharp Int'l Corp. v. State St. Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir.2005) (citing *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n. 5 (2d Cir.1995)); *Geron*

*v. Schulman (In re Manshul Constr. Corp.)*, Nos. 96–B–44080 (JHG), *et al.*, 2000 WL 1228866, at *46 (S.D.N.Y. Aug.30, 2000); *Le Café Creme, Ltd. v. Le Roux (In re Le Café Creme, Ltd.)*, 244 B.R. 221, 239 (Bankr.S.D.N.Y.2000); the proposition that a plaintiff must also plead a *transferee's* fraudulent intent is likewise supported by caselaw, *see, e.g., Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 396 (Bankr.S.D.N.Y. 2007) ("[The debtor] must plead . . . the intent of the transferor and transferee (under NYDCL)."); *Picard v. Taylor (In re Park South Sec., LLC)*, 326 B.R. 505, 517 (Bankr.S.D.N.Y.2005) ("[U]nder section 276 of the N.Y.D.C.L. . . . the Trustee must establish both the debtor's *and* the transferee's actual fraudulent intent.") (emphasis in original); *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 508 (Bankr. S.D.N.Y.2002) ("[NYDCL] section 276 requires a showing that the transferee must have participated or acquiesced in the transferor's fraudulent act . . . .") (internal quotations omitted). Assuming that a transferee's intent must be pled under section 276 of the NYDCL, the Complaint contains allegations of fraudulent intent on the part of the Moving Defendants, as described below, sufficient to raise the curtain for discovery into the Trustee's claims.

■ The Trustee's intentional fraudulent transfer claims under the NYDCL have been sufficiently pled to satisfy the requirements of Rule 9(b). *First*, this Court finds that the factual circumstances constituting fraud, namely the relevant Initial Transfers, have been pled with sufficient particularity.[15] The Trustee has

---

15. Count Five (actual fraud under the NYDCL) has been adequately pled against all of the Moving Defendants, despite the fact that only the Fund Defendants are alleged to have received the Initial Transfers because

the Trustee has properly alleged that the Merkin Defendants received the Initial Transfers as subsequent transferees. *See infra* at Section V; *supra* at n. 11.

provided specific wire transfers from BLMIS to, or for the benefit of, the Moving Defendants, clearly detailing the specific dates, account numbers, amounts, transferor, transferee, and method of transfer. Compl. at ¶¶ 41, 48–50; Ex. B. Eleven Initial Transfers occurred within six years of the Filing Date in the total amount of $494.6 million. *Id.* at ¶ 48. Of these eleven transfers, six were made within two years of the Filing Date, in the collective amount of $313.6 million, including one wire from BLMIS to Gabriel in the amount of $17.4 million, and one wire from BLMIS to Ariel in the amount of $16.2 million, both executed on July 7, 2008, a mere five months before the revelation of the fraud. *Id.* at ¶ 49; Ex. B. Of the six transfers, one alleged preference was made within 90 days of the Filing Date to Ascot in the amount of $45 million, subject to a credit for $10 million deposited by Ascot into the BLMIS account after receipt of this transfer. *Id.* at 50.

 *Second,* this Court finds that the Trustee has properly pled intent under Rule 9(b). To adequately plead intent, the Trustee must allege "facts that give rise to a strong inference of fraudulent intent." *The Responsible Person of Musicland Holding Corp. v. Best Buy Co., Inc. (In re Musicland Holding Corp.),* 398 B.R. 761, 773 (Bankr.S.D.N.Y.2008) (quoting *Shields*

*v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)); *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distributors, Inc.),* 379 B.R. 5, 17 (Bankr. E.D.N.Y.2007). Such facts may either (1) demonstrate that defendants had both the motive and the opportunity to commit fraud; or (2) constitute strong circumstantial evidence of conscious misbehavior or recklessness.[16] *Official Comm. Of Asbestos Claimants of G–I Holding, Inc. v. Heyman,* 277 B.R. 20, 36 (S.D.N.Y.2002).

Here, the Trustee has adequately pled fraudulent intent under the NYDCL, as the facts alleged constitute strong circumstantial evidence of the Moving Defendants' "motive and ... opportunity to commit fraud" or "conscious misbehavior or recklessness." *Pereira v. Grecogas Ltd., et al. (In re Saba Enters., Inc.),* 421 B.R. 626, 642 (Bankr.S.D.N.Y.2009). The Moving Defendants had a motive to continue investing with BLMIS, as Ariel, Gabriel and Ascot were receiving annual returns of between 11–16%, returns "far higher" than elsewhere available and Merkin, either directly or through GCC,[17] received "tens of millions of dollars in management and performance fees." Compl. at ¶¶ 2, 44(f); *King County, Wash. v. IKB Deutsche Industriebank AG, et al.,* No. 09–CIV–8387 (SAS), Slip. Op. at p. 19, 2010 WL 4366191

---

16. This two-prong test is commonly applied to analyze *scienter* in securities fraud actions, but the "same standard has been applied in [the Second] Circuit to non-securities fraud claims." *In re Musicland,* 398 B.R. at 774, n. 7 (applying the two-prong test to establish fraudulent intent under section 544 of the Code and applicable state law); *see also Official Comm. Of Asbestos Claimants of G–I Holding, Inc.,* 277 B.R. at 36–37 (applying the two-prong test to establish fraudulent intent under section 276 of the NYDCL); *In re Saba Enters., Inc.,* 421 B.R. at 641–42 (applying the two-prong test to establish fraudulent intent under section 548(a)(1)(A) of the Code).

17. The Trustee has adequately pled that GCC is plausibly the alter ego of Merkin, who "dominated" GCC as its sole director and sole shareholder, using GCC as a mere instrument to facilitate Merkin's personal interests, rather than any corporate ends. Compl. at ¶ 34. Accordingly, Merkin and GCC are treated as one unit for purposes of determining the sufficiency of the Trustee's allegations. *S. New England Tel. Co. v. Global NAPs Inc.,* No. 08–CV–4518, 2010 WL 3325962, at *17 (2d Cir. Aug. 25, 2010) ("[O]nce alter ego status is established, 'the alter egos are treated as one entity' for purposes of ... liability.") (internal quotations omitted).

(S.D.N.Y. Oct. 29, 2010) (finding "motive" satisfied where defendant received performance and other fees in return for carrying out its financial duties). Merkin maintained a close business and social relationship with Madoff, stretching back to the 1990s, that allowed the Moving Defendants "an almost unique *opportunity* to gain access to extensive information about the operations of BLMIS." Compl. at ¶ 44(t) (emphasis added). Merkin and Madoff served together on the Board of Trustees of Yeshiva University, during which time Merkin diverted university investments entrusted to him to Madoff. *Id.;* see *King County, Wash.,* No. 09–CIV–8387 (SAS), Slip. Op. at p. 20, 2010 WL 4366191 (finding "opportunity" satisfied where, *inter alia,* defendant held position of power and influence). Supporting an inference of conscious misbehavior, the Moving Defendants continued to do business with BLMIS despite instructions from Madoff to refrain from informing investors of BLMIS's role as money manager, and they affirmatively attempted to conceal Madoff's role from investors. Compl. at ¶ 44(b), (s). Merkin, who was responsible for investing the Defendants assets, received warnings of possible fraud from an accountant at GCC, a former fund manager, and other Wall Street professionals. *Id.* at ¶¶ 3, 42, 44(r). Considering the sophisticated nature of the Moving Defendants' business, an inference of recklessness is supported by, *inter alia,* their failure to investigate despite monthly account statements reflecting over 500 securities transactions in prices and quantities outside the daily range possible, *id.* at ¶ 44(g)–(h), and constant abnormally profitable and consistent returns, *id.* at ¶ 44(e). These allegations therefore render plausible the Trustee's claims that all of the Moving Defendants were engaged in conscious misbehavior or recklessness, satisfying the fraudulent intent prong of actual fraud under the NYDCL in accordance with Rule 9(b).[18]

Additionally, the Trustee argues that Merkin's knowledge and actions are attributable to the Fund Defendants by virtue of an agency relationship. *See* Trustee's Mem. Law Opp. Fund Mot. to Dismiss at

---

18. Many courts use "badges of fraud" as a means of pleading fraudulent intent based on circumstantial evidence. *See In re Saba Enters., Inc.,* 421 B.R. at 643; *Picard v. Taylor (In re Park South Sec., LLC.),* 326 B.R. 505, 518 (Bankr.S.D.N.Y.2005). It appears, however, that these badges are designed to establish the fraudulent intent of a transferor, rather than a transferee. Given that the Trustee has adequately pled the transferees' intent under the two-prong test above, the Court need not make a finding with respect to these badges. The above notwithstanding, certain of the badges are satisfied here, including badges (1), (2) and (8). The badges are: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the event and transactions under inquiry; (7) a questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transactions. *Id.* With respect to the first badge, and as discussed more fully *infra* at Section II, the Trustee has successfully pled that the Initial Transfers lacked "fair consideration" and "reasonably equivalent value." In connection with the second badge, Madoff and Merkin had a close business and social relationship. Compl. at ¶ 2. Last, with regard to the eighth badge, every transfer was unusual and secretive in that the Initial Transfers were made in the context of a Ponzi scheme and the Moving Defendants allegedly sought to conceal from investors the role of BLMIS as their money manager. Compl. at ¶ 44(s).

pp. 13–17 (Dkt. No. 63); *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784, 497 N.Y.S.2d 898, 488 N.E.2d 828 (1985) ("The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it.").[19] At the motion to dismiss stage, where the Trustee has not had the opportunity to conduct discovery concerning the relationships between the Moving Defendants, "the question is not whether [the Trustee] ha[s] proved the existence of an agency relationship, merely whether [he] should have the chance to do so." *In re South African Apartheid Litig.*, 617 F.Supp.2d 228, 273 (S.D.N.Y.2009) (quoting *In re Parmalat Sec. Litig.*, 375 F.Supp.2d 278, 294 (S.D.N.Y.2005)).

 None of the Moving Defendants disputes that an agency relationship existed between Merkin and the Fund Defendants; rather, the Fund Defendants unconvincingly argue that the "adverse interest exception" applies to sever their principal-agent relationship with Merkin. The oft-invoked adverse interest exception requires an agent to have "totally abandoned" his principal's interests and be acting "entirely for his own or another's purposes." *Kirschner v. KPMG LLP*, 2010 WL 4116609 (N.Y.2010). That Merkin had abandoned the Funds' interests when he continued to invest with BLMIS is certainly not apparent, as the Funds were receiving the benefit of substantial annual returns that were otherwise unavailable. Compl. at ¶ 44(e)-(f). In any event, this "most narrow of exceptions" involves a fact-intensive inquiry into the subjective motivations of the parties, and thus is inappropriate at the motion to dismiss stage. *Kirschner*, 2010 WL 4116609; *see also Mirror Group Newspapers, plc v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.)*, 164 B.R. 858, 867 (Bankr. S.D.N.Y.1994) ("[T]he adverse interest exception focus[es] attention on the agent's motivation, conduct and dealings in determining whether a clear presumption has been raised that the agent would not communicate to his principal the facts in controversy."). The sole-actor exception, which allows the Trustee to defeat the adverse interest exception upon a showing that "the principal and agent are one and the same," likewise requires a fact-intensive inquiry inappropriate at this stage. *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64, 80 (Bankr.S.D.N.Y.2008) (declining to address sole actor exception to adverse interest exception on motion to dismiss where "there are issues of fact").[20]

## C. The Trustee has Sufficiently Pled Claims for Attorneys' Fees Under Section 276–a of the NYDCL

In light of the foregoing, and at this stage of the proceedings, the Court finds no basis for dismissing the Trustee's request for attorneys' fees in Counts Five,

---

**19.** The Trustee and the Fund Defendants both apply New York law to their analyses of agency; however, if Delaware law were applied, as Gabriel is a limited partnership organized under the laws of Delaware, the result is the same. *See Albert v. Alex. Brown Mgmt. Servs. Inc.*, Civ. Nos. 762–N and 763–N, 2005 WL 2130607, at *11 (Del.Ch. Aug.26, 2005) ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal.").

**20.** As the Trustee has adequately alleged the Moving Defendants' fraudulent intent, they are not entitled at this time to a defense under section 278(2) of the NYDCL as purchasers providing fair consideration. Rather, the Moving Defendants "must affirmatively show good faith in order to take advantage of [s]ection 278(2)." *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 659 (Bankr.E.D.N.Y. 2008).

Nine and Ten of the Complaint.[21] A trustee in bankruptcy is authorized by section 276–a of the NYDCL to recover reasonable attorneys' fees for a fraudulent conveyance action where "such conveyance is found to have been made by the debtor and received by the transferee with actual intent." NYDCL § 276–a. Under this section, the Trustee's entitlement to the relief sought will be adjudicated upon a final judgment, and is accordingly not currently before this Court.

 Notwithstanding the above, getting to the merits, the Merkin Defendants' argument that the relief provided in section 276–a is inapplicable to claims for subsequent transfers recoverable under section 550 of the Code is devoid of merit. The Merkin Defendants fail to cite any caselaw for this proposition, and the Trustee's powers under section 544(b) of the Code incorporate state law rights under the NYDCL, including recovery of attorneys' fees under section 276–a of the NYDCL. *See Pryor v. Zerbo (In re Zerbo)*, 397 B.R. 642, 648 (Bankr.E.D.N.Y. 2008) ("Section 544(b) authorizes the Trustee to avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law. . . . The applicable law upon which the Trustee relies is set forth in Section[ ] . . . 276–a. . . .") (internal citations and quotations omitted). Moreover, the Trustee's request for attorneys' fees is appropriately made in connection with his claims under section 276 of the NYDCL for actual fraudulent transfers, and he has sufficiently alleged facts giving rise to an inference of fraudulent intent on the part of the Moving Defendants. *See* Sections I, B & II. Accordingly, with respect to the Trustee's requests for attorneys' fees in Counts Five, Nine[22] and Ten of the Complaint, the Motions to Dismiss are denied.

## II. THE TRUSTEE HAS SUFFICIENTLY PLED CONSTRUCTIVE FRAUD PURSUANT TO THE CODE AND THE NYDCL

The Trustee has sufficiently pled Count Four of the Complaint pursuant to sections 548(a)(1)(B), 550 and 551 of the Code and Counts Six, Seven and Eight pursuant to sections 273–275 of the NYDCL to avoid and recover transfers on the basis that they were constructively fraudulent.

### A. The Trustee's Constructive Fraud Claims Under the Code Are Adequately Pled

 The Trustee's claims for constructive fraud pursuant to sections 548(a)(1)(B), 550 and 551 of the Code have been sufficiently pled. To prevail on a constructive fraud claim, the Trustee must show, *inter alia*, that the debtor, BLMIS, did not receive "reasonably equivalent value" for the transfer. 11 U.S.C. § 548(a)(1)(B)(i). The heightened federal pleading standard for allegations of fraud does not apply to a complaint to avoid transfers as constructively fraudulent. *See Silverman v. Actrade Capital, Inc. (In*

---

21. Only the Merkin Defendants have argued for dismissal of the Trustee's request for attorneys' fees. However, the Trustee's request for attorneys' fees has been adequately pled as to all of the Moving Defendants.

22. In Count Nine of the Complaint, in addition to attorneys' fees, the Trustee seeks to rely upon the "discovery rule" to avoid actual fraudulent transfers made more than six years before the Filing Date. Count Nine seems to be directed solely at Ascot, the only defendant alleged to have received transfers more than six years before the Filing Date. *See* Compl., Ex. B. Indeed, both Motions to Dismiss are silent as to this count (except with regard to attorneys' fees). As discussed above, as Ascot has not moved or answered, the merits of Count Nine will not be addressed at this time.

*re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 801 (Bankr.S.D.N.Y.2005).

The Moving Defendants argue that the Trustee's constructive fraudulent transfer claims fail as a matter of law because BLMIS received reasonably equivalent value. Relying on caselaw, they reason that each investor in a fraudulent investment scheme holds a claim for fraudulent inducement against the debtor, entitling the investor to restitution of its principal investment. These restitution claims constitute antecedent debts. Under the Code, satisfaction of an antecedent debt constitutes value. 11 U.S.C. § 548(d)(2)(A) (" '[V]alue' means property, or satisfaction or securing of a present or antecedent debt of the debtor...."). Investors' redemptions up to the amount of their principal satisfy the debtor's restitution claim debts, and thus constitute value to the debtor. Here, the Initial Transfers amounted to less than each fund's total principal investment, and therefore were made for value. On these grounds, the Moving Defendants contend that the Trustee's constructive fraudulent transfer claims must fail as a matter of law.

 This argument is faulty because it relies on the premise that the Moving Defendants are "innocent" investors entitled to restitution. Only innocent investors who reasonably believed that they were investing in a legitimate enterprise are entitled to claims for restitution. *See, e.g., Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir.2008) (concluding that "good faith" investors in a Ponzi scheme acquired a claim for restitution up to the amount invested); *In re Hedged–Invs. Assocs., Inc.*, 84 F.3d 1286, 1289–90 (10th Cir.1996) (holding that an investor who was undisputedly "fraudulently induced" to participate in a Ponzi scheme had a restitution claim up to the amount invested); *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944

F.2d 589, 596 n. 7 (9th Cir.1991) ("If investments were made with culpable knowledge, all subsequent payments made to such investors within one year of the debtors' bankruptcy would be avoidable under section 548(a)(2), regardless of the amount invested, because the debtors would not have exchanged a reasonably equivalent value for the payments."); *Lustig v. Weisz & Assocs., Inc. (In re Unified Commercial Capital, Inc.)*, 260 B.R. 343, 351 (Bankr. W.D.N.Y.2001) (noting a "universally accepted fundamental commercial principal that, when you loan an entity money for a period of time in *good faith,* you have given value and are entitled to a reasonable return") (emphasis added); *Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 872 (Bankr.N.D.Ill. 2000) ("[A]n investor having actual knowledge of the underlying fraud may not have a claim for restitution, and will not be deemed to have given reasonably equivalent value in exchange for payments from a Ponzi scheme."). Here, however, the Moving Defendants cannot benefit from the remedy of restitution because the Trustee has sufficiently pled that they were not "innocent" investors; rather, as discussed above, it is plausible that they knew or should have known of the Madoff fraud and helped to perpetuate it.

The Trustee's assertion that only "innocent" investors are entitled to restitution claims is also consistent with the equitable nature of the remedy of restitution. It is well settled that restitution is "a remedy traditionally viewed as 'equitable.' " *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). Thus, investors who have knowledge of, and help perpetuate, a fraud should not be permitted to benefit in the form of restitution. As the Supreme Court pointed out, "one who has himself participated in a violation of law cannot be permitted to

assert in a court of justice any right founded upon or growing out of the illegal transaction." *Gibbs & Sterrett Mfg. Co. v. Brucker,* 111 U.S. 597, 601, 4 S.Ct. 572, 28 L.Ed. 534 (1884). The *Independent Clearing House* case, relied upon by the Moving Defendants, reaches the same conclusion: "For a court to lend its aid to a wrongdo[er] ... is to lend its sanction to the wrong." *Merrill v. Abbott (In re Indep. Clearing House Co.),* 77 B.R. 843, 858 (D.Utah 1987); *see also Cruse v. Callwood,* Nos.2006–71, *et al.,* 2010 WL 438173, at *3 (D.Virgin Is. Feb. 3, 2010) ("[W]e therefore[ ] cannot support the trial court's equitable judgment of restitution where it found that Appellees [w]ere aware of the glaringly iniquitous mechanics of this transparent get-rich-quick scheme."). Accordingly, taking the facts alleged in the Complaint as true, the Moving Defendants are not entitled to restitution claims, and thus cannot be said to have given reasonably equivalent value in exchange for their receipt of transfers.

Logic dictates the same outcome; if the consideration for a transfer is satisfaction of an antecedent debt, the debt must be legally enforceable. Since investors in a Ponzi scheme are entitled to only an equitable right of repayment, there can be no legally enforceable debt if the investors acted in bad faith. Therefore, while innocent investors are entitled to restitution claims up to the amount of their principal, such is not the case when investors, like the Moving Defendants, are alleged to have had knowledge of, and played a part in, furthering the fraud.

In any event, the Court need not make a finding as to the merits of these issues, as they are inappropriate for a motion to dismiss. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.),* 337 B.R. 791, 804 (Bankr.S.D.N.Y.2005). ("[T]he question of 'reasonably equivalent value' ... is fact intensive, and usually cannot be determined on the pleadings."). At this early stage, the Trustee has adequately pled a lack of reasonably equivalent value for purposes of section 548(a)(1)(B) of the Code.

Accordingly, the Trustee has adequately stated a claim for constructive fraudulent transfers under the Code, and the Motions to Dismiss Count Four of the Complaint are denied.

## B. The Trustee Has Sufficiently Pled Constructive Fraud Pursuant to New York State Law

The Trustee's claims for constructive fraud are adequately pled pursuant to the NYDCL. Under the NYDCL provisions governing constructively fraudulent transfers, the Trustee may avoid those transfers for which BLMIS did not receive "fair consideration." NYDCL §§ 273–275. "Fair consideration" requires not only "fair equivalent" property, but also that the transferee receive the transfer in good faith. NYDCL § 272; *HBE Leasing Corp. v. Frank,* 61 F.3d 1054, 1058–59 (2d Cir.1995) (holding that "fair consideration" requires not only that the exchange be for equivalent value, but also that the conveyance be made in good faith); *In re Actrade Fin. Techs. Ltd.* 337 B.R. at 802 ("Under New York law, the party seeking to have the transfer set aside has the burden of proof on the element of fair consideration and, since it is essential to a finding of fair consideration, good faith.") (citing *United States v. McCombs,* 30 F.3d 310, 326 (2d Cir.1994)); *Mendelsohn v. Jacobowitz (In re Jacobs),* 394 B.R. 646, 662 (Bankr.E.D.N.Y.2008) (holding that "fair consideration" has a good faith component). Under the NYDCL, as under the Code, the heightened requirements of Rule 9(b) do not apply to the Trustee's constructive fraud

claims. *See In re Actrade Fin. Techs. Ltd.,* 337 B.R. at 801–02. Rather, "the sole consideration should be whether, consistent with the requirements of Rule 8(a), the complaint gives the defendant sufficient notice to prepare an answer, frame discovery and defend against the charges." *Nisselson v. Drew Indus., Inc., (In re White Metal Rolling & Stamping Corp.),* 222 B.R. 417, 429 (Bankr.S.D.N.Y.1998).

In attempting to defeat the Trustee's NYDCL-based constructive fraud claims, the Fund Defendants erroneously equate "fair consideration" under the NYDCL with "reasonably equivalent value" under the Code. The Fund Defendants summarily state in a footnote that the NYDCL is parallel to Section 548, and therefore "the two statutes are interpreted similarly by the courts." [23] *See* Fund Def. Mem. Law at p. 25 n. 17. Yet their analysis of "reasonably equivalent value" fails to acknowledge the additional express element of "good faith" required under the NYDCL. As this Court has already determined in its discussion of constructive fraud under the Code that the Trustee has adequately pled a lack of reasonably equivalent value, the Fund Defendants' argument must fail.

Conceding the existence of this additional good faith element,[24] the Merkin Defendants argue that the *Sharp* case requires the Trustee to meet a heightened standard for showing lack of good faith. *See generally Sharp Int'l Corp. v. State Street Bank*

& *Trust Co. (In re Sharp Int'l Corp.),* 403 F.3d 43 (2d Cir.2005). The Merkin Defendants contend that *Sharp* holds that in order to plead lack of good faith, a trustee must show that a defendant *participated* in the fraud; actual or constructive *knowledge* is insufficient. *See* Merkin Mem. Law at p. 10, n. 4.

In *Sharp,* the debtor, Sharp International Corporation ("Sharp"), brought actual and constructive fraud claims pursuant to the NYDCL against one of its former lenders, State Street Bank and Trust Company ("State Street"). Sharp's controlling shareholders, the brothers Bernard, Herbert and Lawrence Spitz (the "Spitzes"), had falsified sales, inventory and accounts receivable data and invented customers to report fictitious revenue in its financial records. The Spitzes then used these fraudulent records to obtain loans from banks and other lenders, including a $20 million line of credit from State Street. There were no allegations that State Street was aware of this fraudulent activity at the time that it extended the line of credit. At some point prior to 1997 and continuing through October 1999, the Spitzes looted the fraudulently raised funds, as well as Sharp's corporate profits. *In re Sharp Int'l Corp.,* 403 F.3d at 46.

At some point, State Street came to suspect fraud, largely due to, *inter alia,* Sharp's (i) refusal to comply with certain

**23.** For this proposition, the Fund Defendants cite to the case of *Balaber–Strauss v. Sixty-Five Brokers (In re Churchill Mortgage Inv. Corp.),* 256 B.R. 664 (Bankr.S.D.N.Y.2000). In *Churchill Mortgage,* unlike here, good faith was not at issue because there were no allegations that the defendants had knowledge of, or participated in, the fraud. As such, the court there stated that a "parallel" existed between section 548 of the Code and the NYDCL solely in the context of the *value* of the consideration exchanged for the transfer. *Id.* at 667.

**24.** While the Merkin Defendants similarly argue that reasonably equivalent value under the Code and fair consideration under the NYDCL "have the same fundamental meaning," *see* Merkin Mem Law at p. 10 (citing *In re Churchill Mortgage Inv. Corp.,* 256 B.R. at 677), they do, however, concede in a footnote that the NYDCL defines fair consideration to include a good faith component. *See* Merkin Mem. Law at p. 10, n. 4.

accounting obligations required by a loan agreement with Sharp, (ii) rapid growth, and (iii) huge consumption of cash. *Id.* at 47. State Street conducted a thorough investigation of Sharp and, notwithstanding its knowledge of these red flags, it demanded that Sharp obtain new financing and use these funds to pay off the amount it had drawn down on its State Street line of credit. *Id.* at 47–48. Sharp agreed, raised $25 million from unsuspecting investors, and used $12.25 million to pay off the State Street debt. During this time, State Street did not divulge its concerns about Sharp to anyone, ignored calls from Sharp's noteholders, chose not to exercise its right to foreclose on Sharp's line of credit, and consented to Sharp's new indebtedness. *Id.* at 48.

Sharp, through its trustee in bankruptcy, brought an adversary proceeding against State Street, seeking, *inter alia*, the $12.25 million payment State Street received following the new financing. State Street moved to dismiss, arguing, in relevant part, that Sharp failed to state a claim for constructive fraud under the NYDCL. The bankruptcy court dismissed Sharp's complaint, and the district court and the Second Circuit affirmed. *Id.* at 48–49.

When addressing constructive fraud, the Second Circuit focused on whether Sharp had adequately alleged a lack of "fair consideration" and "good faith" under New York law. The Second Circuit concluded that Sharp had "fail[ed] adequately to allege a lack of 'fair consideration,'" because it had not pled facts demonstrating that State Street had acted in bad faith. *Id.* at 53. Specifically, the Second Circuit held that "State Street's knowledge of the Spitzes' fraud, without more, does not allow an inference that State Street received the $12.25 million payment in bad faith." *Id.* at 56. Rather, under these circum-

stances, the court held that Sharp had to show that State Street participated in the fraud to successfully plead constructive fraud under the NYDCL. *Id.* at 55.

The *Sharp* case is inapposite. Unlike here, where the Trustee has alleged that the Moving Defendants were not "innocent" *at the time they invested with BLMIS*, the *Sharp* case involved an "innocent" lender who acted in good faith *at the time it made the loan to the debtor*, and the loan thus constituted "fair consideration" under the NYDCL. The Second Circuit noted this key distinction:

> In *HBE Leasing I*, the original lender knew *when it extended the credit to the borrower* that the funds advanced might not be used for legitimate corporate purposes, and that knowledge was held to be sufficient notice that the debtor might improperly funnel the proceeds to third parties. This rule has no applicability where, as here, it is undisputed that State Street's loan [to Sharp] was made in good faith *long before the purportedly fraudulent transfer.*

*Id.* at 55 (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 627 (2d Cir.1995) (internal quotations and citations omitted) (emphasis added)); *accord Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 805–06 (Bankr. S.D.N.Y.2005). As the Trustee has alleged that the Moving Defendants knew of the fraud at all relevant times, including the time they transferred funds to BLMIS, such knowledge renders them in bad faith when they received future transfers based on those investments. As the *Sharp* case is therefore distinguishable on its facts, the Trustee need not show participation to demonstrate lack of good faith; a showing of constructive knowledge is sufficient.

Regardless, the Trustee has adequately alleged the Moving Defendants' knowledge *and* participation in Madoff's fraud. As

discussed in depth in Section I, B, the Trustee has enumerated multiple instances of bad faith, thereby adequately pleading a lack of fair consideration for the Initial Transfers. Specifically, the Trustee has pointed to numerous facts demonstrating that the Moving Defendants took large sums of money from their investors and used that money to invest in BLMIS, affirmatively concealed Madoff's role, and thereby profited financially with actual or constructive knowledge that they were participating in and perpetuating a fraud.

Accordingly, at this stage, taking the Trustee's allegations as true, this Court finds that the Trustee has adequately stated a claim for constructive fraudulent conveyance under the NYDCL. As such, the Motions to Dismiss Counts Six through Eight of the Complaint are denied.

### III. THE SAFE HARBOR PROVISION FOR SECURITIES CONTRACTS UNDER SECTION 546(e) DOES NOT BAR THE TRUSTEE'S CONSTRUCTIVE FRAUD CLAIMS

 With regard to the Trustee's Code-based constructive fraud claims, the Fund Defendants additionally argue that they are insulated from liability by the "safe harbor" of section 546(e) of the Code.[25] Section 546(e) provides, in relevant part, that "the trustee may not avoid . . . a transfer made by or to (or for the benefit of) a . . . stockbroker . . . [or] financial institution . . . in connection with a securities contract." 11 U.S.C. § 546(e). A "stockbroker" is a "person—(A) with respect to which there is a customer . . . and (B) that is engaged in the business of

effecting transactions in securities." 11 U.S.C. § 101(53A). A "securities contract," in turn, is defined at length in sections 741(7)(A)(i)-(xi) of the Code as, *inter alia,* "a contract for the purchase, sale, or loan of a security." 11 U.S.C. § 741(7)(A)(i)-(xi). The Fund Defendants argue that the alleged Initial Transfers from BLMIS to their accounts at JPMorgan were made by a stockbroker to a financial institution pursuant to a securities contract, and thus cannot be avoided. The relevant securities contracts, according to the Fund Defendants, are the Account Agreements executed in connection with opening their BLMIS accounts.

The Fund Defendants' invocation of the 546(e) defense is at best premature. Section 546(e) provides an affirmative defense that, unless clearly established on the face of the Complaint, "does not tend to contravert the [Trustee's] *prima facie* case." *DeGirolamo v. Truck World, Inc. (In re Laurel Valley Oil Co.),* No. 07-6109, 2009 WL 1758741 (Bankr.N.D.Ohio, June 16, 2009); *see also Official Comm. Of Unsecured Creditors v. ASEA Brown Boveri, Inc. (In re Grand Eagle Cos., Inc.),* 288 B.R. 484, 495 (Bankr.N.D.Ohio 2003) ("At best, [section 546(e) ] provides [defendant] with an affirmative defense that it may assert should [plaintiff] prevail on the claims it has raised . . . ."); *Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.),* 341 B.R. 451, 455, n. 3 (Bankr.S.D.N.Y.2006) (noting *"the affirmative defense* of the protection of the 11 U.S.C. § 546 safe harbor") (emphasis added).

Assuming, *arguendo,* that the 546(e) defense were timely, the Court cannot find as

---

**25.** Although the Fund Defendants' argument addresses solely whether 546(e) offers protection from the Trustee's constructive fraud claims, *see* Fund. Def. Mem. Law at p. 27, the Court's analysis applies equally to preclude safe harbor protection at this stage of the proceedings from the Trustee's preference and state law fraud claims. Further, the Trustee's actual fraud claims under Section 548(a)(1)(A) of the Code are explicitly excepted from safe harbor protection by the language of the statute. 11 U.S.C. § 546(e).

a matter of law that section 546(e) applies to the transactions at issue. *First,* the Fund Defendants are incorrect in their assertion that "BLMIS clearly falls within the definition of 'stockbroker' for purposes of Section 546(e)." Fund Mem. Law at p. 28. Whether Madoff, through BLMIS, was a stockbroker "engaged in the business of effecting transactions in securities" is dubious. 11 U.S.C. § 101(53A)(B). Courts have held that Ponzi scheme operators do not affirmatively "make securities transactions happen" on behalf of legal "customers," and thus do not fit the definition of "stockbroker" for purposes of section 546(e). *Johnson v. Neilson (In re Slatkin),* 525 F.3d 805, 817 (9th Cir.2008); *Wider v. Wootton,* 907 F.2d 570, 573 (5th Cir.1990). As asserted in the Complaint, Madoff, through BLMIS, "never in fact purchased any of the securities he claimed to have purchased for customer accounts," and "there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the split/strike conversion strategy at … any … trading platform on which BLMIS could have reasonably traded securities." Compl. at ¶ 20. *Second,* even if BLMIS were a stockbroker, the Court questions whether the Account Agreements are securities contracts as that term is conceived by the statute. None of the documents to which the Fund Defendants point is a contract that, by its terms, effects "the purchase, sale, or loan of a security" between the parties or contemplates any particular security transaction. 11 U.S.C. § 741(7)(A). Rather, at most they merely *authorize* one party, Madoff, to act as "agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities" in the future on the Fund Defendants' behalf. Trading Authorization Limited to Pur-

chases and Sales of Securities (incorporated by reference in Compl. at ¶ 38).

Moreover, the Fund Defendants' application of section 546(e) to the Initial Transfers must be rejected as contrary to the purpose of the safe harbor provision and incompatible with SIPA. *See SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 424 B.R. 122, 137 n. 30 (Bankr.S.D.N.Y.2010). Section 546(e) was intended to promote stability and instill investor confidence in the commodities and securities markets. *See* H. Rep. No. 97–420, at 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583 (stating the purpose of 546(e), as amended, is to protect "the stability of the market"); *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),* 247 B.R. 51, 105 (Bankr.S.D.N.Y.1999), *aff'd,* 263 B.R. 406 (S.D.N.Y.2001) (stating that a goal of 546(e) is to "promote investor confidence"). Courts have held that to extend safe harbor protection in the context of a fraudulent securities scheme would be to "undermine, not protect or promote investor confidence … [by] endorsing a scheme to defraud SIPC," and therefore contradict the goals of the provision. *In re Adler,* 247 B.R. at 105 (declining to grant safe harbor protection in fraudulent scheme); *see also Kipperman v. Circle Truste F.B.O. (In re Grafton Partners),* 321 B.R. 527, 539 (9th Cir. BAP 2005) ("The few decisions that involve outright illegality or transparent manipulation reject § 546(e) protection."). Further, in the context of a SIPA proceeding, applying the safe harbor provision would eliminate most avoidance powers granted to a trustee under SIPA, negating its remedial purpose. *See* SIPA §§ 78fff(b), 78fff–2(c)(3).[26] Simply stated, the transfers

---

26. Significantly, in the context of a SIPA proceeding, the Code provisions, including sec-

tion 546(e), are incorporated only "to the

sought to be avoided emanate from Madoff's massive Ponzi scheme, and the safe harbor provision "does not insulate transactions like these from attack." *In re Adler*, 247 B.R. at 105.

In light of the foregoing, the Fund Defendants' arguments under section 546(e) fail to establish a basis for dismissing the Trustee's Code-based constructive fraud claims.

## IV. THE TRUSTEE HAS SUFFICIENTLY ALLEGED THAT MERKIN, AS GENERAL PARTNER OF ASCOT, CAN BE HELD PERSONALLY LIABLE UNDER STATE LAW FOR TRANSFERS MADE TO ASCOT

The Trustee has sufficiently pled Count Eleven of the Complaint to hold Merkin, as general partner, individually liable for any potential judgment against Ascot, which is undisputedly insolvent. Specifically, the Trustee has adequately alleged that personal liability can be attributed to Merkin under Delaware partnership liability law for fraudulent transfers made from BLMIS to Ascot, by virtue of Merkin's position as the sole general partner of Ascot. *See* Compl. at ¶¶ 110–113.

The Merkin Defendants argue that section 550 of the Code, which speci-

fies that the trustee may recover an avoided transfer from (i) an "initial transferee;" (ii) "the entity for whose benefit such transfer was made;" or (iii) "any immediate or mediate transferee of such initial transferee," precludes recovery from Merkin personally as general partner because the Trustee fails to allege that Merkin falls within any of these three statutory classifications.[27] 11 U.S.C. § 550. The Court disagrees that section 550 precludes a state law partnership theory of liability.

Under applicable Delaware law,[28] a general partner of a limited partnership is jointly and severally liable for all of the debts and obligations of the partnership. 6 Del. C. §§ 15–306(a), 17–403(b); *see also Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F.Supp.2d 376, 391 (D.Del.2000) ("General partners in limited partnerships have all the powers and duties of general partners in general partnerships, and are liable for the debts of the partnership."); *In re LJM2 Co–Investment, L.P.*, 866 A.2d 762, 772 (Del.Ch.2004) ("The basic premise of limited partnership law is that general partners are personally liable for partnership obligations but limited partners are not.").

Specifically in the bankruptcy context, general partners can be held personally liable under state law for avoidable

extent consistent with the provisions of [SIPA]." SIPA § 78fff(b).

27. The Merkin Defendants' argument is directly solely at the Trustee's claims under the Code, even though the Complaint also alleges liability under the NYDCL. New York law permits recovery not just from transferees, but also from any individual who benefited from the transfer.

28. Delaware law is applicable, as Ascot is a Delaware limited partnership and its Partnership Agreement specifies that Delaware law will govern. *See* Declaration of Marc E. Hirschfield (Dkt. No. 64) ("Hirschfield

Decl."), Ex. I at 20. While it is arguable that New York law should apply, as Ascot's principal office is located in New York, the analysis would be the same. *See* McKinney's Partnership Law § 98(1); 26(a)(2); 121–403(a) (stating that a general partner of a limited partnership is liable for the partnership's debts and obligations); *U.S. v. 175 Inwood Assocs. LLP*, 330 F.Supp.2d 213, 224 (E.D.N.Y.2004) ("[G]eneral partners in a limited liability partnership are not protected as individuals from liability incurred by the partnership if the assets of the partnership are insufficient to satisfy the liability.").

transfers made to the partnership. A trustee is empowered under section 550(a) of the Code to recover avoided transfers from a partnership as initial transferee, or from the general partner of the partnership under applicable state partnership law. *See Shubert v. Stranahan (In re Penn. Gear Corp.)*, Adv. Nos. 03–940, *et al.*, 2008 WL 2370169, at *9 (Bankr. E.D.Pa. Apr.22, 2008). A partner's "lack of involvement ... does not insulate him from judgment," as his liability arises from his status as general partner. *Id.* at *9. Here, it is undisputed both that (i) Ascot is a limited partnership organized under Delaware state law, and (ii) Merkin was Ascot's sole general partner. As such, any transfers received by Ascot can be recovered from Merkin, as Ascot's only general partner, pursuant to Delaware partnership liability law. Moreover, even if section 550 indeed precludes a state law partnership theory of liability, which it does not, this Court has found that the Trustee sufficiently pled that the transfers to Ascot are recoverable from Merkin as a subsequent transferee under section 550(a)(2) of the Code. *See infra* at Section V. Accordingly, the Trustee has properly alleged a claim for relief against Merkin personally under state partnership law and as a subsequent transferee under the Code.

## V. THE TRUSTEE HAS ADEQUATE-LY PLED CLAIMS TO RECOVER SUBSEQUENT TRANSFERS FROM THE MERKIN DEFEN-DANTS

█ The Trustee has sufficiently pled Count Ten of the Complaint to recover funds subsequently transferred to the Merkin Defendants under section 550(a)(2) of the Code and section 278 of the NYDCL. *See* 11 U.S.C. § 550(a)(2) (allowing recovery from "any immediate or mediate transferee of such initial transferee"); NYDCL § 278 (allowing recovery from "any person"); *Farm Stores, Inc. v. Sch. Feeding Corp.*, 102 A.D.2d 249, 255, 477 N.Y.S.2d 374 (App.Div.2d Dep't 1984) ("*each transferee* ... is liable to the creditor to the extent of the value of the money or property he or she wrongfully received.") (emphasis added).

█ In determining whether a claim to recover fraudulent transfers from a subsequent transferee is adequately pled, the Court need only apply a Rule 8 analysis. *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 317–18 (Bankr.S.D.N.Y.1999) ("[R]ecovery under § 550(a) is not subject to a particularized pleading standard...."). As such, the Trustee must provide only a "short and plain statement of the claim showing that [he] is entitled to relief." FED.R.CIV.P. 8(a)(2). The purpose of this pleading requirement is to ensure that the defendant receives "fair notice of what the ... claim is and the grounds upon which it rests." *Scheidelman v. Henderson (In re Clinton B. Henderson)*, 423 B.R. 598, 612 (Bankr.N.D.N.Y.2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (internal quotations omitted).

The Complaint satisfies Rule 8 by providing "fair notice" to the Merkin Defendants of the Subsequent Transfers sought to be recovered. As discussed previously, the Initial Transfers are set forth with particularity in Exhibit B to the Complaint, specifying the dates upon which they took place, the method of transfer, the transferor, and the specific transferees. Compl., Ex. B. The Complaint then provides that "[o]n information and belief, some or all of [those] Transfers were subsequently transferred by Defendant Gabriel, Ariel or Ascot directly or indirectly to Defendants Merkin and/or GCC in the form of payment of commissions or fees." Compl. at ¶ 106. Such commissions or

fees were paid in the predetermined amounts, as described in the Funds' Offering Memoranda, of 1% of the net asset value, and 20% of the increase in value, of Gabriel and Ariel, and 1.5% of the net asset value of Ascot each year. *See* Hirschfield Decl., Exs. A, B, C (Offering Memoranda of Ariel, Gabriel and Ascot, respectively). This arrangement ultimately yielded "tens of millions of dollars in management and performance fees." Compl. at ¶ 2. The Complaint thus "adequately apprises" the Merkin Defendants, the alleged recipients of these fees, of "which transactions are claimed to be fraudulent and why, when they took place, how they were executed and by whom."[29] *Stratton Oakmont, Inc.*, 234 B.R. at 318; *see also Silverman v. K.E.R.U. Realty Corp. (In re Allou Distributors, Inc.)*, 379 B.R. 5, 30–31 (Bankr.E.D.N.Y.2007) (finding subsequent transfer claim adequately pled where complaint stated, "at least tens of millions of dollars were fraudulently diverted from [debtor] to [initial transferees] . . . [and] a portion of these fraudulently diverted funds was transferred from the [initial transferees] to, or for the benefit of, the [subsequent transferees].").

By virtue of their position as general partner of, and sole investment advisor to, Gabriel and Ariel, respectively, the Merkin Defendants presumably have exclusive access to more detailed information regarding the proportion of their fees attributable to their BLMIS investments, and discovery of such information is warranted on the basis of the Trustee's allegations. Accordingly, the Motions to Dismiss are denied with respect to Count Ten of the Complaint.

## VI. THE TRUSTEE HAS SUFFICIENTLY PLED A BASIS FOR DISALLOWING THE MOVING DEFENDANTS' SIPA CLAIMS

The Trustee has sufficiently pled Count Twelve of the Complaint to disallow the Moving Defendants' SIPA claims. Ariel and Gabriel[30] argue that they have valid SIPA claims because (1) any transfers they received are not subject to avoidance actions, and (2) the amount the Trustee is seeking to recover is far less than the value of their claims against the BLMIS estate as determined by their last account statements. However, the Court

**29.** Although not necessary for the Court's decision, the Court is aware of additional information regarding the proportion of the Initial Transfers paid to the Merkin Defendants as fees for BLMIS investments provided in public records and certain attached documents, including the motion papers filed by the Merkin Defendants themselves. *See* Merkin Mem. Law at p. 5 (stating that as of December 2008, approximately 30% of Gabriel's and Ariel's respective assets were invested with BLMIS); *State of New York v. J. Ezra Merkin, et al.*, 907 N.Y.S.2d 439, (N.Y.Sup.Ct.2010) ("From 2001 to 2008, between 20–30% of the assets of Gabriel and Ariel were managed by Madoff."); Hirschfield Decl., Ex. D (Excerpts from Amended Complaint in the matter of *The People of the State of New York v. J. Ezra Merkin, et al.*, No. 450879–09, 2010 WL 936208) (alleging that the total fees taken by Merkin and GCC is approximately $169 mil-

lion from Ascot between 1995 and 2007, ¶ 35; $242 million from Ariel between 1989 and 2007, ¶ 69; and $277 million from Gabriel between 1989 and 2007, ¶ 69). The amended complaint in the matter of *The People of the State of New York v. J. Ezra Merkin, et al.* additionally provides a table showing the proportion of Gabriel's assets allocated to BLMIS. Amended Complaint in the matter of *The People of the State of New York v. J. Ezra Merkin, et al.*, No. 450879–09, 2010 WL 936208 (N.Y.Sup.Ct.2009).

**30.** Although only the Fund Defendants objected to the Trustee's disallowance of their SIPA claims, *see* Fund Mem. Law at pp. 33–36, Count Eleven of the Complaint has been adequately pled as to all of the Moving Defendants.

finds that the Trustee has adequately alleged a basis for disallowing their claims.

*First,* while the transfers at issue have not been avoided as of this early stage, the Trustee has sufficiently alleged, as discussed above, that the Fund Defendants are "transferee[s] of a transfer avoidable under section ... 544 ... 547, [or] 548" of the Code, an express ground for disallowance under section 502(d) of the Code. 11 U.S.C. § 502(d). *Second,* although the Fund Defendants argue that "BLMIS's books and records are irrelevant, because the only record that matters under SIPA is the customer's last account statement," Fund Mem. Law at p. 33, this Court has already determined in its net equity decision that the fictitious last account statements are not controlling for purposes of determining customers' SIPA claims. *See SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 424 B.R. 122, 135 (Bankr.S.D.N.Y.2010) (discussing books and records requirement for allowance of SIPA claims).

Accordingly, the Motions to Dismiss with respect to the Trustee's objection to SIPA claims are denied.

## VII. THE TRUSTEE HAS NOT SUFFICIENTLY PLED TURNOVER AND ACCOUNTING PURSUANT TO SECTION 542 OF THE CODE

With respect to Count One of the Complaint, the Trustee has not adequately stated a claim for immediate turnover of transferred funds and accounting under section 542 of the Code.

Section 542 of the Code states, in relevant part, that "an entity ... in possession, custody, or control, during the case, of [property of the estate] ... shall deliver to the trustee, and account for, such property or the value of such property." 11 U.S.C. § 542(a). The Moving Defendants argue that the Trustee may not use section 542 of the Code to recover prepetition transfers because they do not become "property of the estate" unless and until they are recovered through a successful avoidance action, which in essence requires a two-step process. *FDIC v. Hirsch (In re Colonial Realty Co.),* 980 F.2d 125, 131 (2d Cir.1992); *Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.),* 325 B.R. 134, 137 (Bankr.S.D.N.Y.2005) ("[P]roperty that has been fraudulently or preferentially transferred does not become property of the estate until it has been recovered."). In contrast, the Trustee contends that in this hybrid proceeding under both SIPA and the Code, SIPA section 78fff–2(c)(3) alters the nature of section 542 of the Code to permit a SIPA trustee to recover prepetition transfers in one step upon a *prima facie* showing that the transfer is "voidable or void," without the need for an avoidance action and separate recovery under section 550 of the Code. SIPA § 78fff–2(c)(3).

As evidenced by the divergent positions taken by the Trustee and the Moving Defendants, the plain language of SIPA section 78fff–2(c)(3) is subject to differing interpretations, and there is a dearth of interpretative caselaw. In fact, only nine cases address SIPA section 78fff–2(c)(3), three of which merely cite the statute without analysis or discussion.[31] Yet, none

---

31. Three of the nine cases merely cite to SIPA section 78fff–2(c)(3) without any analysis or discussion. *Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.),* 435 B.R. 866, 886 (Bankr.S.D.N.Y.2010); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff),* 429 B.R. 423, 427, n. 4 (Bankr.S.D.N.Y.2010) (Lifland, J.); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 424 B.R. 122, 136 (Bankr.S.D.N.Y.2010) (Lifland, J.). The remaining six cases analyze SIPA section 78fff–2(c)(3) in conjunction with avoidance provisions of the Code, supporting

of these cases addresses the instant question as to whether SIPA section 78fff–2(c)(3) makes property that was transferred prepetition to a third party "property of the debtor" for purposes of turnover under section 542 of the Code. Thus, the Court requested and reviewed supplemental briefing from the parties to address this issue (the "Supplemental Briefing") (Dkt. Nos. 78–80).

Consistent with the Trustee's position and the bankruptcy court's expansive *in rem* jurisdiction,[32] the most efficient application of the hybrid SIPA and Code statutes is to bypass the two-step recovery process and allow the Trustee to expeditiously collect the funds using turnover under section 542 of the Code. Unfortunately, however, there is nothing in the plain language of SIPA section 78fff–2(c)(3) or in the limited interpretive caselaw to give such an *"in rem* spin" to the Trustee's one-step turnover quest under section 542 of the Code.[33]

The plain language of SIPA section 78fff–2(c)(3) creates a fiction that grants the trustee standing to bring avoidance actions under the Code. The avoidance provisions of the Code allow a trustee to "avoid any transfer ... of *an interest of the debtor in property.*" 11 U.S.C. §§ 547, 548 (emphasis added). In a SIPA proceeding, however, property held by a broker-debtor for the account of a customer is not property of the broker-debtor. Thus, a SIPA trustee would lack standing to utilize these avoidance sections. SIPA section 78fff–2(c)(3) states, in relevant part,

> [T]he Trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11. Such recovered property shall be treated as customer property. *For the purposes of such recovery, the property so transferred shall be deemed to have been the property of the debtor* and, if such transfer was made to a customer or for his benefit, such customer shall be deemed to have been a creditor, the laws of any State to the contrary notwithstanding.

SIPA § 78fff–2(c)(3) (emphasis added). SIPA section 78fff–2(c)(3) rectifies this defect by creating a fiction that such property *"shall be deemed to have been the property of the debtor"* at the time of the transfer.[34] SIPA § 78fff–2(c)(3) (emphasis added).

the Moving Defendants' interpretation. *Picard v. Taylor (In re Park South Sec., LLC.),* 326 B.R. 505, 512–13 (Bankr.S.D.N.Y.2005); *Trefny v. Bear Stearns Sec. Corp.,* 243 B.R. 300, 320–23 (S.D.Tex.1999); *Kusch v. Mishkin (In re Adler, Coleman Clearing Corp.),* Nos. 95–08203(JLG), *et al.,* 1998 WL 551972, at *17 (Bankr.S.D.N.Y. Aug.24, 1998); *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),* 218 B.R. 689, 702 (Bankr.S.D.N.Y. 1998); *Hill v. Spencer S & L Ass'n (In re Bevill, Bresler & Schulman, Inc.),* 94 B.R. 817, 825–27 (D.N.J.1989); *Hill v. Spencer S & L Ass'n (In re Bevill, Bresler & Schulman, Inc.),* 83 B.R. 880, 886–88 (D.N.J.1988) ("*Bevill I").*

**32.** *See Cent. Virginia Comm. Coll. v. Katz,* 546 U.S. 356, 369, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006) (supporting the bankruptcy court's expansive *in rem* jurisdiction by upholding a trustee's avoidance actions against a state agency); *State Comp. Ins. Fund v. Zamora (In re Silverman),* No. 08–56508, 2010 WL 3169415, at *6 (9th Cir. Aug.12, 2010) (holding that a chapter 11 trustee may avoid and recover criminal restitution payments under section 547(b) of the Code).

**33.** It is conceivable, however, for the Trustee to find support at law outside of turnover, including the utilization of provisional remedies such as attachment.

**34.** Similarly, SIPA section 78fff–2(c)(3) provides that a customer in receipt of a preference "shall be deemed to have been a creditor" at the time of transfer in order to ensure

Further, the few cases construing SIPA section 78fff–2(c)(3) find that its limited purpose is to create this legal fiction. *Bevill I*, 83 B.R. at 894 ("This fiction allows the SIPA trustee to avoid ... transfers in spite of the fact that a broker-dealer liquidation technically does not involve the debtor-creditor relationship...."). Indeed, the six courts that have analyzed this provision have done so only in the context of avoidance actions, never in conjunction with section 542 of the Code. *See Picard v. Taylor (In re Park South Sec., LLC.)*, 326 B.R. 505, 512–13 (Bankr.S.D.N.Y.2005) (reading SIPA Section 78fff–2(c)(3) together with sections 544 and 548); *Kusch v. Mishkin (In re Adler, Coleman Clearing Corp.*, Nos. 95–08203(JLG), *et al.*, 1998 WL 551972, at *17 (Bankr.S.D.N.Y. Aug.24, 1998)) (stating that courts have held that SIPA section 78fff–2(c)(3) authorizes a trustee *to avoid* a transfer of customer property); *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 218 B.R. 689, 702 (Bankr.S.D.N.Y.1998) (finding that SIPA section 78fff–2(c)(3) does not limit a trustee's avoidance power under section 544); *Trefny v. Bear Stearns Secs. Corp.*, 243 B.R. 300, 320–23 (S.D.Tex. 1999) (reading SIPA Section 78fff–2(c)(3) together with section 548); *Hill v. Spencer S & L Ass'n (In re Bevill, Bresler & Schulman, Inc.)*, 94 B.R. 817, 825–27 (D.N.J.1989) (reading SIPA Section 78fff–2(c)(3) together with section 549); *Bevill I*, 83 B.R. at 886–88 (same).

Thus, the Court is constrained to find that while the Trustee has stated *prima facie* claims for avoidance under the Code and the NYDCL, the current state of the law does not support the requested *expeditious* turnover of the funds under section 542 of the Code. To hold otherwise would

give the "deemed to have been property of the debtor" language a more expansive meaning, something that Congress did not address.

In light of the foregoing analysis, the Motions to Dismiss are hereby granted with respect to Count One of the Complaint.

### CONCLUSION

Accepting as true the facts pled in the Complaint and drawing all inferences that may be warranted by such facts, the Trustee has pled valid *prima facie* claims against the Moving Defendants in Counts Three through Twelve of the Complaint for, *inter alia*, avoidance of the redemption payments in their entirety under sections 548(a)(1)(A) and 548(a)(1)(B) of the Code and corresponding sections of the NYDCL. The Trustee may or may not prove the requisite facts to establish the elements of his claims or to rebut the Moving Defendants' assertions of good faith after discovery and a trial on the merits. Nevertheless, the Trustee's claims have been adequately pled, and the Motions to Dismiss under Rule 12(b)(6) are therefore DENIED as to these claims. With respect to Counts One and Two of the Complaint, the Trustee has not adequately stated a claim for immediate turnover of transferred funds under section 542 of the Code and SIPA section 78fff–2(c)(3) and has not asserted a preference claim under section 547 against the Moving Defendants, and the Motions to Dismiss are therefore GRANTED in this limited respect.

**IT IS SO ORDERED.**

---

that the SIPA trustee has standing under section 547 of the Code. *See* 11 U.S.C. § 547 ("[T]he trustee may avoid any transfer of an interest of the debtor in property—(1) *to or for the benefit of a creditor....*").